Dennis PRINGLE and Christine A. Pringle, in their own right as parents and natural guardians of Austin Pringle, a minor, Appellants

v.

Adolfo RAPAPORT, D.O. and Adolfo Rapaport, D.O., P.C., Appellees.

Superior Court of Pennsylvania.

Argued Sept. 4, 2008.

Filed Aug. 31, 2009.

Douglas L. Price, Pittsburgh, for appellants.

Bernard R. Rizza and John W. Jordan IV, Pittsburgh, for appellee.

BEFORE: FORD ELLIOTT, P.J., STEVENS, MUSMANNO, ORIE MELVIN, LALLY–GREEN *, KLEIN, GANTMAN, PANELLA and DONOHUE, JJ.

OPINION BY DONOHUE, J.:

¶ 1 Dennis Pringle and Christine Pringle (collectively, "the Pringles"), in their own right as parents and natural guardians of their son Austin Pringle ("Austin"), appeal from the judgment entered following a jury verdict in a medical malpractice case in favor of appellees, Adolfo Rapaport, D.O., and Adolfo Rapaport, D.O., P.C. (collectively, "Dr.Rapaport").[1]   The

---

* Judge Lally–Green did not participate in the consideration or decision of this case.

1.  The jury's verdict was in favor of Dr. Rapaport alone.  Before the case was submitted to the jury, however, the parties stipulated that

Pringles contend that the trial court erred, *inter alia*, in including an "error of judgment" instruction during the charge to the jury at the trial of their medical malpractice action against Dr. Rapaport. After an exhaustive review of decisional law, we conclude that the Supreme Court of Pennsylvania has never addressed the appropriateness of this charge, and that the decisions of panels of this Court are irreconcilable. Thus, following our careful review, we conclude that the "error of judgment" instruction should not be given in medical malpractice actions, as it does not inform jurors on the applicable standard of care and instead tends only to confuse, rather than clarify, the issues the jury must decide. We thus reverse and remand for a new trial.

¶ 2 On July 31, 2002, Dr. Rapaport delivered Mrs. Pringle's second child, Austin. N.T., 6/26/06, at 120. Austin's birth was complicated because his shoulder was stuck behind his mother's pubic bone, a condition known as shoulder dystocia. *Id.* at 103. During Austin's delivery, Dr. Rapaport suspected shoulder dystocia when he observed Austin's head deliver but then retract back into the birth canal, a tell-tale sign of the condition. N.T., 6/28/06, at 109. To determine whether he was dealing with shoulder dystocia, Dr. Rapaport placed a hand on Austin's head and applied traction to see whether the shoulder would move. *Id.* at 110–11.

¶ 3 When Austin's shoulder did not move, Dr. Rapaport engaged three maneuvers to remedy the situation. First, Rapaport tried the "McRoberts maneuver," which involved Mrs. Pringle's legs being drawn up toward her shoulders while Dr. Rapaport placed his hands on Austin's head and applied traction in an effort to

free Austin's shoulder. *Id.* at 114. Because this did not remedy the situation, Dr. Rapaport tried a second technique, the application of suprapubic pressure to Mrs. Pringle's abdomen, again while applying traction to Austin's head. *Id.* at 115, 118. When this resulted in no progress, Dr. Rapaport engaged a third maneuver, a "corkscrew procedure," that involved a manual turning of Austin's shoulders. This successfully led to Austin's delivery. *Id.* at 121.

¶ 4 Upon delivery, Austin's right arm was limp. *Id.* at 127. It was subsequently determined that during delivery, multiple nerves in Austin's neck were torn apart, causing an injury to the brachial plexus, which is the web of tissue and nerves located in that area. Brachial plexus injuries involve the stretching or tearing to some or all of the five nerves located in the neck, which are referred to as C–5, C–6, C–7, C–8 and T–1. N.T., 6/26/06, at 108. Most commonly with these injuries, the two highest nerves, C–5 and C–6, are injured. *Id.* at 109. C–7 and C–8 are much less frequently injured. *Id.* In Austin's case, all five nerves were injured; most drastically, C–5 was ruptured, or torn apart, and C–6, C–7, and C–8 had been ripped from his spine, or avulsed. *Id.* at 130. Although T–1 was not ruptured or avulsed, it was injured. *Id.* at 111. This brachial plexus injury caused the paralysis of Austin's right arm. Brachial plexus injuries are uncommon occurrences and an injury as severe as Austin's is extremely rare. *Id.*

¶ 5 The Pringles filed an action against Dr. Rapaport, alleging that he was negligent by using excessive force on Austin's head during delivery and that the exces-

the jury would be charged only as to Dr. Rapaport and that the trial court would mold the verdict after trial to include both defen-

dants jointly and severally. N.T. 6/28/06, at 179.

sive force caused the brachial plexus injury and resultant paralysis. Appellant's Brief at 5. At trial, the expert testimony presented by both sides agreed that shoulder dystocia is an emergency situation. The expert witnesses also agreed that Dr. Rapaport used the proper procedures in the proper sequence to resolve the shoulder dystocia in this case—the McRoberts maneuver first, suprapubic pressure second, and the "corkscrew procedure" third. N.T., 6/26/06, at 112–14; N.T., 6/28/06, at 40–43.

¶ 6 The expert witnesses disagreed, however, as to whether Dr. Rapaport applied excessive force when performing the corkscrew procedure. For the Pringles, Dr. Joseph Finkelstein ("Dr.Finkelstein") testified that the force applied by Dr. Rapaport was excessive because an injury as severe as the one suffered by Austin, in which nerves were ruptured and torn, does not occur from "the normal forces of labor and requires an excessive traction to be applied beyond [what] the baby can handle." N.T., 6/26/06, at 132. Dr. Finkelstein opined that this injury does not result absent the negligent application of force by the delivering physician. *Id.* at 133. He further testified that there is no way to quantify at what point the force becomes excessive, but that determination of the proper amount of force is a skill learned through hands-on training. *Id.* at 115, 144.

¶ 7 Rapaport's expert, Dr. Tom Benedetti ("Dr.Benedetti") agreed that the proper amount of force to apply in a corkscrew procedure is a skill learned through training and experience, and that the amount of force Dr. Rapaport exerted on Austin was excessive and caused the injury. N.T., 6/28/06, at 21, 37. Dr. Benedetti opined, however, that in his professional opinion Dr. Rapaport's application of excessive force was not negligent: "[T]he

word excessive is, to me, not the operative word. The operative word is negligent, because I think that the traction was excessive in that it was more than the baby's brachial plexus could tolerate; but it was not negligent, because I could find no evidence that it was any more than what was usually done in normal deliveries. . . ." *Id.* It was Dr. Benedetti's opinion that brachial plexus injuries may still occur even when proper (non-negligent) care is provided. N.T., 6/28/06, at 46.

¶ 8 Dr. Rapaport similarly testified that the amount of force that should be applied in performing the corkscrew procedure is a skill "that's learned over time from being taught with other people's hands on yours as you do deliveries. . . . And it all comes down to a tactile sense as you're applying traction . . . and your experience in what you've done[.]" *Id.* at 82. He stated that he was trained both as to the amount of force to be applied when dealing with shoulder dystocia and as to how to minimize the amount of force applied to the infant's head in such a situation. *Id.* at 89–90. Dr. Rapaport testified that Austin presented the most severe case of shoulder dystocia that he had ever encountered and that he applied the same amount of traction to Austin as he does in every other delivery. *Id.* at 150. Although he agreed that the application of excessive force can cause a brachial plexus injury, he denied that he applied excessive force in Austin's case. *Id.* at 141, 150–51. To the contrary, Dr. Rapaport insisted that his actions saved Austin's life. *Id.*

¶ 9 Accordingly, the expert witnesses and Dr. Rapaport all agreed that the "corkscrew procedure" is an accepted method for relieving shoulder dystocia, that Dr. Rapaport decision to utilize that procedure was appropriate under the circumstances presented, and that the proper amount of force to apply when utilizing the

procedure is a skill that is learned and refined through training and practice. The only issue of dispute was whether Dr. Rapaport executed the corkscrew procedure in a negligent manner.

¶ 10 At the close of the evidence, the trial court charged the jury, in relevant part, as follows:

Generally, folks, negligence can be defined as follows: Negligence is otherwise known as carelessness, and it is the absence of ordinary care which a reasonably prudent person would exercise in the circumstances here presented. Negligent conduct may consist of an act or an omission to act where there is a duty to do so. In other words, negligence is the failure to do something which a reasonably careful person would do or the doing of something which a reasonably careful person would not do in light of all of the surrounding circumstances that are established by the evidence and the testimony in this case. So folks, you must determine how a reasonably careful person would have acted under the circumstances presented here.

What's ordinary care? Ordinary care is the care that a reasonably careful person would use under circumstances presented in this case, because, folks, it's the duty of every person, all of us, to use ordinary care not only for our own safety in the protection of our own property but also to avoid injuries to others.

What constitutes ordinary care varies according to the circumstances and conditions of each case, and the amount of care required by the law must be in keeping with the degree of danger that's involved in the circumstances. All right. Those are general definition of negligence and ordinary care. Now let's talk about specific negligence in regard to

physicians, or what can be referred to as professional negligence.

Professional negligence consists of a negligent, careless or unskilled performance by a physician of the duties imposed on him by his professional relationship with his patients. So folks, it's also negligence when a physician shows a lack of proper care and skill in the performance of a professional act. A physician must have and use the same knowledge and skill and exercise the same care as that which is usually had and exercised in the medical profession. A physician whose conduct does not meet this professional standard of care is negligent.

Now folks, a physician who holds himself out as a specialist in a particular field of medicine must have and use the same knowledge and skill and exercise the same care as that which is usually had and exercised by other specialists in that same medical specialty, or same medical area. A specialist whose conduct does not meet this professional standard of care is negligent. Folks, any physician must also use the same degree of care as would a reasonable person under the circumstances, and if he fails to do so, he is negligent.

So you folks must decide whether [Dr. Rapaport] was negligent in any of these respects. You must determine whether or not [Dr. Rapaport] held himself out as a specialist in a particular field of medicine, and whether or not he had and used the same knowledge and skill and exercised the same care as that which is usually had and exercised by other specialists in the same medical specialty. Again, a specialist whose conduct does not meet this professional standard of care is negligent.

Next, folks, [the Pringles] must establish [Dr. Rapaport's] negligence . . . as I

said, by the greater weight of the evidence. That's the fair weight or the preponderance of the evidence. [The Pringles] may do this by circumstantial evidence, that is, by proving facts and circumstances from which negligence may be reasonably inferred. You may infer that the harm suffered by ... Austin was caused by negligence of [Dr. Rapaport] if your find the following three factors are present: First, that the accident, or the harm involved here, is of a kind that ordinarily does not occur in the absence of negligence. In this connection, you may consider the general knowledge of the community, the evidence of the parties or expert testimony. Second, that other responsible causes, including the conduct of [the Pringles] and third persons, have been sufficiently eliminated by the evidence presented, but it is not necessary that [the Pringles] exclude all other possible causes for [Austin's] injuries. Evidence that it is more likely than not that [Austin's] injuries were caused by [Dr. Rapaport's] negligence is sufficient to permit the inference. In this connection, if you find that [Dr. Rapaport] had exclusive control involved here at the time when the negligence that is claimed would have occurred, you may determine that such other causes have been sufficiently eliminated. And the third factor, that the negligence claimed was within the scope of [Dr. Rapaport's] duty to [Austin].

Although [Dr. Rapaport] is not required to offer an explanation for the occurrence of the accident, or the harm here, if he does so, it is for you to weigh that explanation in relation to all evidence to determine whether negligence by [Dr. Rapaport] may be reasonably inferred. *Folks, if a physician has used his best judgment and he has exercised reasonable care and he has the requisite knowledge or ability, even though complications resulted, then the physician is not responsible, or not negligent. The rule requiring a physician to use his best judgment does not make a physician liable for a mere error in judgment provided he does what he thinks best after careful examination.*

The rule of reasonable care does not require the exercise of the highest possible degree of care, but requires only that the doctor exercise that degree of care that a reasonably prudent physician would have exercised under the same circumstances as presented here.

***Physicians who exercise the skill, knowledge and care customarily exercised in their profession are not liable for a mere mistake of judgment. Under the law, physicians are permitted a broad range of judgment in their professional duties, and they are not liable for errors of judgments unless it is proven that an error of judgment was the result of negligence.*** And folks, as a general proposition that applies in any case, doctors or physicians do not guarantee a cure to their patients, and negligence should not be presumed from the occurrence of an unfortunate result.

N.T., 6/29/06, at 79–80 (emphasis added).

¶ 11 Following deliberations, the jury returned a verdict for Dr. Rapaport. The Pringles filed a post-trial motion seeking a new trial, which the trial court denied. They then filed a timely appeal to this Court, raising two challenges to the trial court's charge to the jury:

I. Did the trial court err when it instructed the jury ... to decide the issue of negligence by considering the physician's subjective judgment?

II. Was the trial court's instruction to the jury that "Physicians do not guaran-

tee a cure and negligence should not be presumed from the occurrence of an unfortunate result," in inextricable conflict with the [Pringle's] accepted *"Res Ipsa Loquitur"* charge?

Appellants' Brief at 4. This Court decided to hear the case *en banc, ab initio.*

¶ 12 Our standard of review when considering the adequacy of jury instructions in a civil case is to "determine whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case." *Stewart v. Motts*, 539 Pa. 596, 654 A.2d 535 (1995). It is only when "the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue" that error in a charge will be found to be a sufficient basis for the award of a new trial. *Id.* at 540; *Ferrer v. Trustees of University of Pennsylvania*, 573 Pa. 310, 345, 825 A.2d 591, 612 (2002); *see also Tindall v. Friedman*, 970 A.2d 1159, 1175 (Pa.Super.2009).

¶ 13 For their first issue on appeal, the Pringles contend that the trial court erred in including "error of judgment" instructions in its charge to the jury (highlighted in the charge set forth above). An "error of judgment" charge provides generally that physicians are not responsible for "mere errors in judgment" or the use of "best judgment" unless the resulting error constitutes, or was the result of, negligence. The Pringles argue that this instruction improperly advises the jury on the well-established applicable standards for medical malpractice and is also likely to mislead and confuse the jury in its deliberations. Appellant's Brief at 12. For the reasons that follow, we agree.

¶ 14 We begin with a review of the history of the standard of care for physicians in Pennsylvania and the role of judgment in determining whether the standard of care has been violated. Among the oldest cases addressing the issue is *McCandless v. McWha*, 22 Pa. 261, 1853 WL 6450 (1853), in which our Supreme Court reversed a verdict of $800 for the plaintiff. The trial court instructed the jury that the defendant physician had an obligation to set the plaintiff's broken leg so that it was straight and of equal length with the other,. and that if he did not "he was accountable in damages, just as a stone-mason or bricklayer would be in building a wall of poor materials, and the wall fell down, or if they built a chimney and it should smoke by reason of a want of skill in its construction." *Id.* at *5. Our Supreme Court disagreed with the comparison of a physician's duty of care to that of a stone-mason or bricklayer, indicating instead that "[t]he implied contract of a physician or surgeon is not to cure—to restore a fractured limb to its natural perfectness—but to treat the case with diligence and skill." *Id.* Instead, the Supreme Court held that "the question is not whether the doctor had brought to the case skill enough to make the leg as straight and long as the other, but whether he had *employed such reasonable skill and diligence, as are ordinarily exercised in his profession." Id.* (emphasis added). In judging the degree of skill required in a given case, "regard is to be had to the advanced state of the profession at the time." *Id.*

¶ 15 While this description of the physician's standard of care remained in effect without change for over a hundred years, its application in specific cases proved difficult. In particular, our appellate courts struggled to explain the interrelated notions that a doctor does not promise a cure and that mistakes by doctors are not necessarily the result of negligence. In *Williams v. LeBar*, 141 Pa. 149, 21 A. 525 (1891), for example, the plaintiff brought an action against the defendant physicians

for signing a certificate stating that the plaintiff was insane, even though they had not carefully examined him. The trial court found that the plaintiff was not insane and that the defendants were wrong in their conclusions to the contrary, but nevertheless refused to find that they were negligent for their faulty diagnosis. Our Supreme Court agreed, stating, "[The trial court] very properly held that no presumption of negligence arose from the mere fact that the defendants were mistaken as to the insanity.... The most the case discloses is an *error of judgment,* to which the most careful and skillful physician is liable in a mysterious disease like insanity." *Id.* at 159, 21 A. at 525; *see also English v. Free,* 205 Pa. 624, 626, 55 A. 777, 777 (1903) ("It may be that Dr. Free was mistaken in his diagnosis. [But] the undisputed testimony of quite a number of surgeons, called as witnesses, is that this injury is such that it is very difficult to detect its exact character.").

¶ 16 This Court used the same phrase, "error of judgment", to absolve a physician from liability in *Remley v. Plummer,* 79 Pa.Super. 117, 1922 WL 2863 (1922). In *Remley,* the jury returned a verdict of $3,000 for plaintiff after the administration of a general anesthetic for minor surgery to the plaintiff's finger resulted in his sudden death. This Court reversed the judgment, concluding that "if the symptoms are obscure or such that even a skillful practitioner might after using his best knowledge and judgment be mistaken in his diagnosis, he is not liable for such *error of judgment* and a jury will not be permitted to return a verdict against him by

reason thereof." [2]  *Id.* at *3 (emphasis added).

¶ 17 And in *Ward v. Garvin,* 328 Pa. 395, 195 A. 885 (1938), our Supreme Court affirmed a trial court's entry of compulsory nonsuit in a case brought by a husband and wife after the doctor misdiagnosed an injury to the wife's foot. In a single paragraph *per curium* decision, the Supreme Court stated simply that "a physician is not responsible for an *error in judgment* or a mistake in diagnosis in the treatment of a patient." *Id.* at 395, 195 A. at 885 (emphasis added); *but see Hodgson v. Bigelow,* 335 Pa. 497, 518, 7 A.2d 338, 348 (1939) ("The rule in Pennsylvania, is *not* that 'for a mistake in diagnosis there is no liability,' but it is that for 'a mistake in diagnosis *where the symptoms were obscure* there is no liability.' ") (emphasis in original).

¶ 18 In *Ward,* the Supreme Court cited to its prior decision in *Duckworth v. Bennett,* 320 Pa. 47, 181 A. 558 (1935), in which it stated that "[w]here the most that the case discloses is an error of judgment on the surgeon's part, there is no liability." The Supreme Court's rationale for affirming the physician's non-liability in *Duckworth,* however, differed from that applied in its previous misdiagnosis cases. In *Duckworth,* a 16 year-old plaintiff fell and suffered an injury to his leg. The defendant physician performed an examination of the plaintiff, which included measuring the plaintiff's legs to ascertain whether there was a problem with his hip. The plaintiff's legs measured the same length, indicating to the defendant physician the lack of any hip injury. The defendant physician diagnosed the plaintiff with ar-

**2.** This Court in *Remley* was also the first appellate court in Pennsylvania to recognize the "two schools of thought" doctrine, pursuant to which a physician will not be held liable if he chooses a course of treatment advocated by a "considerable number of his professional brethren", even if competent medical authority is divided on the issue. *Id.* at *3. Our Supreme Court first applied the "two schools of thought" doctrine in *Duckworth v. Bennett,* 320 Pa. 47, 181 A. 558 (1935), discussed *infra.*

thritis of the knee and prescribed a course of treatment that included manual manipulations of the plaintiff's knee. Initially the leg showed improvement, but approximately eight weeks later, during one of the manual manipulations, the defendant physician noticed a lack of full movement. Based upon this observation, the defendant physician ordered an X-ray, which revealed an injury to the femur. The injury caused one of the plaintiff's legs to be shortened by 1¼ inches.

¶ 19 The plaintiff brought suit against the defendant physician, alleging negligence in waiting eight weeks to take an X-ray and that the delay resulted in the permanent shortening of the leg. Relying upon what has come to be referred to the "two schools of thought" doctrine, our Supreme Court concluded that the defendant physician could not be found liable for choosing an accepted course of treatment:

> We think it could not be held to be negligence or unskillful treatment for a doctor not immediately to employ the X-ray in his investigation of a patient's condition; whether this or another method of inquiry shall be resorted to is a matter of judgment, and a failure to use the one or the other could not be said to be negligence. Where the most that the case discloses is an errer [sic] of judgment on the surgeon's part, there is no liability.... At most, all that could be said is that defendant had made a mistake in diagnosis where the symptoms were obscure, and for this there is no liability. *Where competent medical authority is divided, a physician will not be held responsible if, in the exercise of his judgment, he followed a course of treatment advocated by a considerable number of his professional brethren in good standing in the community.* A physician is required to exercise only such reasonable skill and diligence as is ordinarily exercised in his profession.

*Id.* at 50–51, 181 A. at 559 (emphasis added).

¶ 20 Twenty-four years later, our Supreme Court set forth its first substantive restatement of the physician's standard of care in its decision in *Donaldson v. Maffucci*, 397 Pa. 548, 156 A.2d 835 (1959). Affirming a trial court's entry of a compulsory non-suit following the close of plaintiff's evidence at trial, the Supreme Court, held that:

> The standard of care required of a physician or surgeon is well-settled. In the absence of a special contract, a physician or surgeon is neither a warrantor of a cure nor a guarantor of the result of his treatment. *McCandless v. McWha*, 22 Pa. 261, 267; *Tyson v. Baizley*, 35 Pa.Super. 320, 322. A physician who is not a specialist is required to possess and employ in the treatment of a patient the skill and knowledge usually possessed by physicians in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment; and in employing the required skill and knowledge he is also required to exercise the care and judgment of a reasonable man.

*Id.* at 553–54, 156 A.2d at 838.[3] Unlike in prior cases, the Supreme Court in *Donaldson* did not focus on the physician's alleged

---

**3.** The Supreme Court in *Donaldson* separately reaffirmed the "two schools of thought" doctrine, citing to its earlier decision in *Duckworth v. Bennett*:

> [A] physician or surgeon is not bound to employ any particular mode of treatment of a patient, and, where among physicians or surgeons of ordinary skill and learning more than one method of treatment is recognized as proper, it is not negligence for the physician or the surgeon to adopt either of such methods.
> 
> *Id.*

errors of judgment, but rather on whether he failed to "exercise skill and diligence" in treating his patient. *Id.* at 555–56, 156 A.2d at 839.[4]

¶ 21 The Supreme Court again refused to exonerate a physician's errors based upon a mistake of judgment in *Smith v. Yohe*, 412 Pa. 94, 194 A.2d 167 (1963). In *Yohe*, an elderly man (Smith) fell in his home and the family physician (Yohe) was summoned. Following Yohe's examination of Smith, he prescribed a course of physical therapy and bed rest. Eleven days later, at his own insistence, Smith was taken to the hospital and X-rayed. The X-ray revealed a fracture of Smith's femur, asceptic necrosis and a demineralization of his pelvic bones. Smith filed a medical malpractice claim against both Yohe and the orthopedic surgeon that treated him at the hospital. At the conclusion of Smith's evidence, both doctors moved for the entry of compulsory nonsuits, and both were granted.

¶ 22 On appeal, Smith alleged that Yohe was negligent for not using the requisite standard of care by failing to have X-rays taken to diagnose his condition. *Id.* at 100, 194 A.2d at 171. In reversing the trial court's entry of a compulsory nonsuit, our Supreme Court distinguished the case from *Duckworth*:

> While in both cases the plaintiffs had sustained falls, the plaintiff in *Duckworth* was a 16 year old boy whose bone structure was much less prone to fracture than Mr. Smith, an elderly man, whose bones by reason of age would naturally be somewhat brittle.... In *Duckworth*, there was nothing to place the doctor on notice, save the boy's fall, of any injury to the hip area which

might suggest any possibility of a fracture in that area. In the case at bar, the patient was an elderly man, with a paralyzed right side, who fell and, in so doing, his right leg became flexed; his fall was attended by severe and constant pain not only in the knee area but also the upper part of the leg and the hip; ... It is clear that in *Duckworth* any symptoms of a fracture of the hip were obscure and the pre-X-ray examinations of the doctor contraindicated any possibility of a hip fracture; in the case at bar, bearing in mind the age and health of the patient, the symptoms pointed, rather emphatically, to the possibility, if not the probability, of a fracture in the hip area.

*Id.* at 103–04, 194 A.2d at 172–73. Based upon these significant differences between the two cases, our Supreme Court refused to find that Yohe's misdiagnosis was an error of judgment:

> Dr. Yohe urges that, even if he should have and did not take X-rays, such constituted an error of judgment for which he is not liable. In our opinion, there is a vast difference between an error of judgment and negligence in the collection and securing of factual data essential to arriving at a proper conclusion or judgment. If a physician, as an aid to his diagnosis, i.e. his judgment, does not avail himself of the scientific means and facilities open to him for the collection of the best factual data upon which to arrive at his diagnosis, the result is not an error of judgment but negligence in failing to secure an adequate factual basis upon which to support his diagnosis or judgment.

---

4. "Whether or not Dr. Maffucci exercised skill and diligence in his treatment of Mrs. Donaldson and whether or not the condition of her wrist and fingers was attributable to any fail- ure to exercise skill and diligence on Dr. Maffucci's part required the production of expert testimony which the appellants failed to furnish." *Id.* at 555–56, 156 A.2d at 839.

*Id.* at 105, 194 A.2d at 173. Again, as in *Donaldson,* the Supreme Court's focus was on whether the physician violated the requisite standard of care, not on whether he committed an error of judgment.

¶ 23 In its formulation of the physician's standard of care, the Supreme Court in *Yohe* reaffirmed its formulation of the same as set forth in its decision in *Donaldson* (quoted above). In a list of eight principles "in this area of the law", the Supreme Court included that "a physician is not liable for an error of judgment," citing to, *inter alia,* its older decisions in *LeBar, Duckworth,* and *Ward. Id.* at 99, 194 A.2d at 170. Addressing the same issue again eight years later in *Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d 206 (1971), however, the Supreme Court included no similar reference to errors of judgment in its formulation of the principles relevant to a physician's standard of care.

¶ 24 *Incollingo* involved the death of six-year old Mary Ann Incollingo ("Mary Ann") from complications arising from the administration of the antibiotic drug Chloromycetin. On separate occasions, two physicians (Dr. Cucinotta and Dr. Levin) prescribed Chloromycetin to Mary Ann, though neither doctor performed blood tests or took bacterial cultures before doing so. Mary Ann became ill and eventually died from aplastic anemia, which Dr. Cucinotta determined resulted from her repeated ingestion of Chloromycetin. When her parents brought suit against both doctors (among others), Dr. Cucinotta challenged the determination that his conduct fell below the standard of care for physicians (relying on *Donaldson* ). In affirming the jury's verdict for Mary Ann's parents, the Supreme Court disagreed:

> The testimony to the effect that a large percentage of Philadelphia doctors would have given the same course of treatment as did Dr. Cucinotta was

based on the opinions of plaintiffs' experts that Chloromycetin was being misused for trivial complaints by doctors who did not read or pay attention to the warnings or who had been 'oversold' by the drug company's detail men. Dr. Cucinotta did not fit into these categories; he had read the warnings, he knew of the dangers, he had not been oversold. The dispute as to Dr. Cucinotta's conduct, therefore, narrows down to the accuracy of his diagnosis, and whether it could or could not have been made clinically; to the interpretation of 'intermittent' use, and whether blood tests were or were not mandated in light of three courses of treatment of the drug separated by roughly six and nine months, respectively. There was no testimony that, given Dr. Cucinotta's knowledge and awareness, a substantial number of doctors at the time and place would have followed the same procedures. Thus Dr. Cucinotta, rejecting the indiscriminate use of the drug which, it was said by plaintiffs, was then characteristic of the medical profession in Philadelphia, could not limit his own responsibility to the skill and knowledge of the norm; and in exercising the knowledge he himself possessed, he was required to employ the care and judgment of a reasonable man in like circumstances.

*Id.* at 276–77, 282 A.2d at 214.

¶ 25 Dr. Levin presented a markedly different defense, arguing that he had never paid any attention to the written warnings about Chloromycetin and that prescribing antibiotics over the telephone without seeing the patient was an accepted practice among physicians in the Philadelphia community during that period of time. *Id.* at 280, 282 A.2d at 216. Rejecting the argument that the medical profession may set its own standard of conduct by establishing a custom of practice (even

if potentially harmful), the Supreme Court concluded that "the statement that 'A physician is required to exercise only such reasonable skill and diligence as is ordinarily exercised in his profession' ... is not to be taken in isolation, and in disregard of the admonition to give due regard to the advanced state of the profession and to exercise the care and judgment of a reasonable man in the exercise of medical skill and knowledge." *Id.* at 283, 282 A.2d at 217.

¶ 26 The Supreme Court in *Incollingo* thus made clear that the standard of care for physicians is an objective one—physicians must have and employ the same skill and knowledge typically used by physicians in the medical profession, and must keep themselves informed of contemporary developments in the profession. Notably, in its two applications of the standard of care in *Incollingo,* the Supreme Court made no allowance for errors in a physician's judgment. To the contrary, it did not even entertain the suggestion that either Dr. Cucinotta or Dr. Levin might be absolved of liability for "mere errors in judgment" in prescribing Chloromycetin to Mary Ann. Instead, the Supreme Court found that the conduct of both doctors fell below an objective standard of care and thus were negligent.

¶ 27 Following *Incollingo,* in 1981 the Committee on Proposed Standard Civil Jury Instructions, appointed by the Supreme Court of Pennsylvania, issued its first set of Proposed Standard Civil Jury Instructions. Following the *Donaldson–Yohe–Incollingo* line of cases, the Committee has established a basic instruction for a physician's standard of care in a medical malpractice case that remains in effect today: "A physician must have the same knowledge and skill and use the same care normally used in the medical profession. A physician whose conduct falls below this

standard of care is negligent." Pa.SSJI (Civ) 11.01 (2009). Importantly, since 1981 the Committee's standard of care instruction has never contained any reference to a physician's judgment or included any "error of judgment" language. *See* Pa. S.S.J.I. (Civ.) 10.03A (2003); Pa. S.S.J.I. (Civ.) 10.03A (1981). The Committee's omission in this regard is intentional, as it has explained in detail:

> There is no reference to a physician's "judgment" in this instruction for the following reasons.... The focus, under Pennsylvania law, is on whether the physician's conduct comported to the requisite standard of care. Simply put, if a physician does not 'exercise reasonable care,' that physician will not be insulated from liability based on the fact that this failure constituted a 'mere error in judgment,' or what he or she thought 'best after a careful examination.' Conversely, if a physician does 'exercise reasonable care,' that physician will generally not be liable, notwithstanding that he or she committed a 'mere error in judgment,' or failed to do what he or she thought 'best after a careful examination.' In either case, such factors are but elements of the overarching concept of due care. Clearly, the use of phrases regarding mistakes or errors in judgment, best judgment, and the like, in the decisional law of this Commonwealth, are meant to help illustrate the parameters of the standard of care of physicians, and are not meant to pose additional requirements for defendants, on one hand, or to undermine the bedrock 'reasonable care' requirement on the other. However, the inclusion of such phrases in jury instructions seems unlikely to serve that purpose. To the contrary, such phrases, at worst, risk misstating the law. At best, they seem unnecessarily circular in form. In any event, such language

seems far more likely to mislead and confuse the jury rather than to enlighten it.

Pa. SSJI (Civ.) 11.01 (2009) (Subcommittee Note) (internal citations omitted). For these reasons, the Committee determined that the principle expressed by an "error of judgment" charge (*i.e.*, that a physician may make an error that does not rise to the level of a breach of the standard of care) is adequately covered in a jury charge by the basic instruction on the professional standard of care. *Id.*

¶ 28 Since the issuance of the suggested civil jury instruction in 1981, several panels of this Court have addressed decisions of trial courts either to give, or refuse to give, "mistake of judgment" charges to juries, with essentially irreconcilable results. In *D'Orazio v. Parlee & Tatem Radiologic Associates, Ltd.*, 850 A.2d 726 (Pa.Super.2004), *appeal denied*, 582 Pa. 699, 871 A.2d 191 (2005), for example, a panel of this Court affirmed a trial court's decision not to give an "error of judgment" charge in a case involving allegations that the defendant radiologists could have detected the plaintiff's breast cancer sooner if they had not misinterpreted early mammograms and failed to order further diagnostic tests. *Id.* at 728. The panel indicated that while the standard charge on a physician's duty of care could itself be simplified, "it is far less confusing than first telling the jury that a doctor is not responsible for an error in judgment and then providing an exception if the judgment was below the standard of care." *Id.* at 729. As a result, the panel concluded that "[a] judgment is an act of a physician like any other decision a physician makes, and, except in the rarest of cases, the 'error in judgment' charge is much more likely to confuse than clarify." *Id.; see also Tindall v. Friedman*, 970 A.2d 1159,

1176 (Pa.Super.2009) (affirming the trial court's refusal to give the charge); *Vallone v. Creech*, 820 A.2d 760, 764–66 (Pa.Super.) (plaintiff entitled to a new trial after trial court gave "error of judgment" instruction to jury), *appeal denied*, 574 Pa. 755, 830 A.2d 976 (2003); *Gunn v. Grossman*, 748 A.2d 1235, 1244 (Pa.Super.) (physician's contention that he was entitled to new trial based upon the trial court's refusal failure to give an "error of judgment" charge was "utterly devoid of merit" because of totality of the charge, which included the definition of medical negligence and requirement of causation), *appeal denied*, 564 Pa. 711, 764 A.2d 1070 (2000).

¶ 29 In other cases, however, panels of this Court have reached precisely the opposite conclusion. *Blicha v. Jacks*, 864 A.2d 1214 (Pa.Super.2004), for example, involved allegations that the defendant physician was negligent for two reasons: (1) his decision to order laboratory tests rather than immediately hospitalizing the patient after a routine office visit, and (2) the delay in attempting to contact the patient immediately after receiving the test results, and by contacting the patient's employer rather than engaging in more aggressive attempts to locate him directly. Before the physician's message could be delivered, the police found the patient dead in his home. *Id.* at 1216.

¶ 30 A panel of this Court affirmed the trial court's decision to instruct the jury that a physician is not liable for "a mere error of judgment" so long as the "medical judgment itself" satisfied the physician's standard of care. The panel concluded that the physician "ordered diagnostic testing and made a medical judgment to attempt to contact his patient when he received the results." *Id.* at 1220. As a result, the panel concluded that the "error

of judgment charge" was "clear, accurate, and more than adequate."[5] *Id.; see also Havasy v. Resnick*, 415 Pa.Super. 480, 609 A.2d 1326, 1336 (1992) ("error of judgment" instruction was appropriate because expert testimony established that the patient's condition was difficult to diagnose early, particularly where the symptoms may have been obscured by a prior injury); *Schaaf v. Kaufman*, 850 A.2d 655, 666 (Pa.Super.2004) ("error of judgment" charge not grounds for reversal where charge as a whole accurately reflects that doctors are liable if they deviate from the standard of care); *Fragale v. Brigham*, 741 A.2d 788, 791 (Pa.Super.1999) ("error of judgment" instruction appropriate so long as jury is also charged on the doctor's obligation of reasonable care), *appeal denied*, 563 Pa. 629, 758 A.2d 662 (2000); *Soda v. Baird*, 411 Pa.Super. 80, 600 A.2d 1274, 1282 (1991) (same), *appeal denied*, 532 Pa. 665, 616 A.2d 986 (1992).

¶ 31 These irreconcilable decisions of panels of this Court leave the state of the law regarding "error of judgment" instructions in flux, as it would appear that trial courts are routinely affirmed whether they do, or do not, include the instruction in jury charges. In highlighting the confusion in this area, we note that just 21 days before it strongly disapproved of the use of the instruction in *D'Orazio*, the *same three judge panel* affirmed a trial court's use of the instruction in *Schaaf*. These conflicting decisions provide little or no guidance to trial courts and litigants, and thus necessitate clarification through this *en banc* review. For the reasons set forth hereinbelow, we conclude that "error of judgment" instructions should not be given in medical malpractice actions in this Commonwealth.[6]

---

**5.** In *King v. Stefenelli*, 862 A.2d 666 (Pa.Super.2004), a panel of this Court upheld the use of an "error of judgment" charge on the grounds that the surgeon made a "judgment call" to use one of several acceptable methods to explore an abdomen for sporadic bleeding. *Id.* at 672. Rather than an "error of judgment" charge, the appropriate instruction in these circumstances (where there is more than one accepted method of treatment or procedure), is a "two schools of thought" instruction. Pa. SSJI (Civ.) 11.04 (2009); *see also Gala v. Hamilton*, 552 Pa. 466, 470, 715 A.2d 1108, 1110 (1998); *Jones v. Chidester*, 531 Pa. 31, 40–41, 610 A.2d 964, 968 (1992). We note that the "two schools of thought" doctrine has no application in the case presently on appeal, as its application is limited to situations where there are alternative courses of treatment or procedures from which to choose. *See, e.g., Choma v. Iyer*, 871 A.2d 238, 241 (Pa.Super.2005). In this case, all agree that Dr. Rapaport utilized the appropriate course of treatment (the McRoberts maneuver, then suprapubic pressure, and then the corkscrew procedure).

**6.** A substantial number of other states have ruled that the use of "error of judgment" instructions are never proper in medical malpractice cases. *See, e.g., Papke v. Harbert*, 738 N.W.2d 510, 517–26 (S.D.2007) (listing cases); *Bickham v. Grant*, 861 So.2d 299, 303 (Miss.2003); *Yates v. Univ. of West Virginia Bd. of Trustees*, 209 W.Va. 487, 496–97, 549 S.E.2d 681, 689–92 (2001); *Hirahara v. Tanaka*, 87 Hawai'i 460, 464, 959 P.2d 830, 834 (1998); *Rooney v. Medical Center Hosp. of Vermont, Inc.*, 162 Vt. 513, 520, 649 A.2d 756, 760 (1994); *Jefferson Clinic, P.C. v. Roberson*, 626 So.2d 1243, 1247 (Ala.1993); *Peters v. Vander Kooi*, 494 N.W.2d 708, 712 (Iowa 1993); *Rogers v. Meridian Park Hosp.*, 307 Or. 612, 619, 772 P.2d 929, 933 (1989); *Sleavin v. Greenwich Gynecology and Obstetrics, P.C.*, 6 Conn.App. 340, 347, 505 A.2d 436, 440 (1986); *but see Ward v. Glover*, 206 S.W.3d 17, 41 (Tenn.2006); *DiFranco v. Klein*, 657 A.2d 145, 148–49 (R.I.1995); *Fraijo v. Hartland Hosp.*, 99 Cal.App.3d 331, 342–43, 160 Cal.Rptr. 246 (1979). Some other states permit the use of the instruction only in the limited circumstance where the facts of the case present a "two schools of thought" scenario. *See, e.g., Das v. Thani*, 171 N.J. 518, 527–28, 795 A.2d 876, 881–82 (2002); *Francoeur v. Piper*, 146 N.H. 525, 530, 776 A.2d 1270, 1275 (2001); *Borja v. Phoenix General Hosp., Inc.*, 151 Ariz. 302, 304, 727 P.2d 355, 357–58 (1986); *Kobos v. Everts*, 768 P.2d 534, 537–38 (Wyo.1989).

¶ 32 In the case presently before the Court, the trial court explained its rationale for including "mistake of judgment" instructions in the jury charge by noting that "[u]nder the evidence presented in the case at bar, the jury could easily have concluded that Dr. Rapaport non-negligently misjudged the amount of traction he could use without injuring Austin Pringle's brachial plexus." Trial Court Opinion, 12/19/06, at 4. Relying on this Court's prior decisions in *Havasy, Blicha,* and *King,* the trial court found that Dr. Rapaport's decision regarding how much traction to use was a "medical judgment," and thus the "mistake of judgment" instruction was appropriate on the facts of this case. *Id.*

¶ 33 Whether or not Dr. Rapaport's conduct at issue in this case involved his use of judgment has been a point of contention between the parties. Dr. Rapaport agrees with the trial court that performance of the corkscrew method required him to make a judgment regarding how much traction to employ. The Pringles contend instead that Dr. Rapaport's judgment was not at issue in the case, as they do not allege that he misdiagnosed Austin's condition (shoulder dystocia) or that he failed to select the proper course of treatment to remedy it (the McRoberts maneuver, suprapublic pressure, then the corkscrew procedure). Instead, the Pringles maintain that Dr. Rapaport was negligent in his *execution* of the corkscrew procedure. Appellants' Brief at 13.

¶ 34 We need not resolve this debate between the parties, since whether or not Dr. Rapaport's execution of the cork-

screw method involved one or more subjective judgments on his part is not relevant to the resolution of this appeal. The issue presented here is whether or not an "error of judgment" instruction should have been included in the jury charge. As this Court has repeatedly held, "[t]he purpose of charging the jury is to clarify issues which the jurors must determine." *See, e.g., Machado v. Kunkel,* 804 A.2d 1238, 1243 (Pa.Super.2002), *appeal denied,* 572 Pa. 766, 819 A.2d 547 (2003); *Cunningham v. Byers,* 732 A.2d 655, 659 (Pa.Super.1999). The fundamental issue in medical malpractice cases, as in all types of negligence cases, is whether the defendant violated the applicable standard of care and, if so, whether that violation resulted in injury to the plaintiff. Thus we must determine whether an "error of judgment" instruction serves to clarify this fundamental issue.[7] For at least two reasons, we conclude that the instruction is inherently confusing for juries and thus has no place in medical malpractice cases.

¶ 35 First, the "error of judgment" charge wrongly suggests to the jury that a physician is not culpable for one type of negligence, namely the negligent exercise of his or her judgment. This is simply untrue, since in all medical malpractice actions "[t]he proper focus is whether the physician's *conduct* (be it an action, a judgment, or a decision) was within the standard of care." *D'Orazio,* 850 A.2d at 726 (emphasis in original). If, on one hand, a physician's conduct violates the standard of care, then he or she is negligent regardless of the nature of the conduct at issue.

---

7. The Dissent suggests that *King, Havasy,* and *Vallone,* when read together, compel the conclusion that an "error of judgment" instruction is proper in every case in which the breach of the physician's standard of care remains in doubt. Dissenting Opinion at 178. Under this analysis, unless the outcome hinged on causation or damages, the "error of judgment" charge would be permissible in every medical malpractice case. Our precedent is otherwise. *See, e.g., Tindall,* 970 A.2d at 1176; *D'Orazio,* 850 A.2d at 728; *Gunn,* 748 A.2d at 1244. Thus we conclude that our cases are irreconcilable.

If, on the other hand, a physician's conduct does not violate the standard of care, then he or she has not, by definition, committed any culpable error of judgment. As such, after a jury has been charged on the fundamental principles regarding a physician's standard of care, adding an "error of judgment" instruction only confuses, and does not clarify, the determinative issue regarding deviation from the standard of care.[8]

¶ 36 Second, the "error of judgment" charge wrongly injects a subjective element into the jury's deliberations. The standard of care for physicians in Pennsylvania is objective in nature, as it centers on the knowledge, skill, and care normally possessed and exercised in the medical profession. The "error of judgment" charge improperly refocuses the jury's attention on the physician's state of mind at the time of treatment, even though the physician's mental state is irrelevant in determining whether he or she deviated from the standard of care. Furthermore, by directing the jury's attention to what the physician may have been thinking while treating the patient, the jury may also be led to conclude that only judgments made in bad faith are culpable—even though a doctor's subjective intentions while rendering treatment are likewise irrelevant to the issues placed before a jury in a medical malpractice case.

¶ 37 As such, the "error of judgment" instruction neither defines nor clarifies the applicable standard of care, and may likely mislead the jury during its deliberations. In attempting to resolve the conflicting

panel decisions from the Court, we note that the cases approving the charge have tended to rely primarily on the Supreme Court's inclusion of the statement that "a physician is not liable for an error of judgment," in its list of eight general principles of medical malpractice law in its 1963 decision in *Smith v. Yohe. Yohe*, 412 Pa. at 99, 194 A.2d at 170 (citing to its older decisions in *LeBar* (1891), *Duckworth* (1935), and *Ward* (1938)). Such reliance is misplaced, however, because the inclusion of this statement in *Yohe* was only *dicta*, as it played no role in the Court's resolution of the case.[9] The Supreme Court also addressed the same issue (the physician's standard of care) in both *Donaldson* (1959) and *Incollingo* (1971), but made no similar reference to "errors of judgment" in either of those cases.

¶ 38 More importantly, even to the extent that the "error of judgment" statement in *Yohe* remains an accurate statement of a nuance of Pennsylvania law, this does not mean that it should be included in a charge to a jury. As this Court has recognized, "[j]ust because an appellate court uses certain language in an opinion does not necessarily mean it is appropriate for a lay juror." *D'Orazio*, 850 A.2d at 728; *cf. Rogers v. Meridian Park Hospital*, 307 Or. 612, 616, 772 P.2d 929, 931 (1989) ("[B]ecause many appellate opinions are written with no view that they will be turned into instructions, care must be exercised in using the language of these opinions for instructions to juries."). In neither *Yohe* nor any of the cases cited therein (*LeBar, Duckworth,* and *Ward* )

---

**8.** We further note that the use of the phrase *"mere* error of judgment" only compounds the problem, as it suggests that a physician's errors in judgment may not be serious enough to impose liability, even if negligent.

**9.** To the contrary, the Supreme Court in *Yohe* rejected the physician's argument that his in-

accurate diagnosis of the plaintiff's condition was the result of the exercise of his best judgment. As discussed above, the Supreme Court instead concluded that the doctor's failure to order X-rays to assist with the diagnosis fell below the applicable standard of care. *Yohe*, 412 Pa. at 105, 194 A.2d at 173.

did the Supreme Court address the propriety of including an "error of judgment" instruction in a jury charge in a medical malpractice action.

¶ 39 To the contrary, our Supreme Court has never sustained, or even considered, the use of an "error of judgment" instruction in a jury charge. Noting that the Supreme Court has denied allowance of appeal or dismissed the appeal as improvidently granted in some of the panel decisions discussed herein (*D'Orazio, Vallone, Gunn, Havasy, Schaaf, Fragale,* and *Soda* ), the Dissent contends that the Supreme Court also "has never repudiated its use despite multiple opportunities to do so." Dissenting Opinion at 180. Respectfully, this conclusion violates long-standing dictates of our Supreme Court. In *Salazar v. Allstate Ins. Co.,* 549 Pa. 658, 702 A.2d 1038 (1997), the Supreme Court indicated that the denial of a petition for allowance of appeal "does not constitute or imply an endorsement by the Supreme Court of the position taken by the Superior Court or the Commonwealth Court; it is, instead, a discretionary order, and of no precedential value." *Id.* at 668 n. 10, 702 A.2d at 1043 n. 10; *see also Myhalyk v. Lewis,* 398 Pa. 395, 402, 158 A.2d 305, 308–09 (1960).[10] Moreover, the Dissent's conclusion is based on speculation that the "error of judgment" instruction was the basis for the petitions for allowance of appeal in the cases cited. Because all of these panel decisions included multiple issues, and since the issues presented for review in petitions for allowance of appeal are often only a subset of the voluminous number of issues decided by this Court, there is simply no way of knowing whether the issue of the appropriateness of the "error of judgment" instruction has ever appeared in a petition for allowance of review decided by the Supreme Court.

▉ ¶ 40 When a jury charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue, a new trial is warranted. *Stewart v. Motts,* 539 Pa. 596, 606, 654 A.2d 535, 540 (1995). For the reasons set forth herein, we conclude that the trial court erred as a matter of law by including "error of judgment" instructions in its jury charge in this case. Rather than clarifying the legal principles at issue, these instructions likely misled the jury. Accordingly, the Pringles are entitled to a new trial.

▉ ¶ 41 For their second issue on appeal, the Pringles challenge the trial court's jury charge on grounds that it contained inconsistent instructions regarding *res ipsa loquitur.* Appellant's Brief at 24. The doctrine of *res ipsa loquitur* is a rule of circumstantial evidence. *MacNutt v. Temple University Hospital, Inc.,* 932 A.2d 980, 986 (Pa.Super.), *appeal denied,* 596 Pa. 708, 940 A.2d 365 (2007). Our Supreme Court described its purpose and application in medical malpractice cases as follows:

> Because medical malpractice is a form of negligence, to state a *prima facie* cause of action, a plaintiff must demonstrate the elements of negligence: a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of harm. With all but the most self-evident medical malpractice actions there is also the

10. Our Supreme Court has likewise explained that the dismissal of an appeal as improvidently granted has the same effect as if the court had not granted the petition for allowance of appeal in the first place; moreover, "the lower tribunal's opinion and order stand as a decision of that court and [the Supreme Court's] order has no precedential value." *Commonwealth v. Tilghman,* 543 Pa. 578, 590, 673 A.2d 898, 904 (1996).

added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation.

Res ipsa loquitur allows juries to infer negligence from the circumstances surrounding the injury. *Res ipsa loquitur*, meaning literally "the thing speaks for itself," is a shorthand expression for circumstantial proof of negligence-a rule of evidence. It is a rule that provides that a plaintiff may satisfy his burden of producing evidence of a defendant's negligence by proving that he has been injured by a casualty of a sort that normally would not have occurred in the absence of the defendant's negligence.

*Quinby v. Plumsteadville Family Practice, Inc.*, 589 Pa. 183, 198–99, 907 A.2d 1061, 1071 (2006) (citations and footnotes omitted).

¶ 42 Before a plaintiff may invoke *res ipsa loquitur*, all three of its elements must be established. *MacNutt*, 932 A.2d at 987. Our Supreme Court has adopted the definition of this evidentiary rule as set forth in Section 328D of the Restatement (Second) of Torts, which provides,

It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when

(a) the event is of a kind which ordinarily does not occur in the absence of negligence;

(b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

*Quinby*, 589 Pa. at 198–99, 907 A.2d at 1071; *MacNutt*, 932 A.2d at 987–88.

¶ 43 In the present case, Dr. Rapaport conceded that the Pringles had established these three elements and were entitled to a *res ipsa loquitur* charge. N.T., 6/29/06, at 33, 78–79. Accordingly, there is no contest here as to whether the charge should have been given. Rather, the Pringles argue that although the trial court gave the *res ipsa loquitur* charge as requested, it erred by following that instruction with another that directly contradicted it. Appellant's Brief at 24.

¶ 44 As set forth hereinabove, in its jury charge the trial court provided the requested *res ipsa loquitur* instruction. N.T., 6/29/06, at 78–79. Then after providing the "error of judgment" instructions, it concluded as follows:

And folks, as a general proposition, that applies in any case, doctors, or physicians, do not guarantee a cure to their patients, *and negligence should not be presumed from the occurrence of an unfortunate result.*

*Id.* at 80 (emphasis added). It is this portion of the charge that the Pringles challenge as improperly given. Appellant's Brief at 24–25.

¶ 45 These two instructions are clearly contradictory, as the *res ipsa loquitur* charge instructed the jury that it could infer the occurrence of negligence from the occurrence of the injury, but the complained-of charge then specifically prohibited such an inference by informing the jury that it may not presume negligence as a result of the injury. There is nothing in the balance of the jury charge that clarifies this obfuscation. Accordingly, the Pringles are likewise entitled to a new trial on this basis.

¶ 46 Judgment reversed. Case remanded. Jurisdiction relinquished.

¶ 47 Judge ORIE MELVIN files a Dissenting Opinion in which Judge GANTMAN joins.

DISSENTING OPINION BY ORIE MELVIN, J.:

¶ 1 I respectfully dissent from the majority's decision to reverse the judgment in favor of Appellees. I further disagree with the majority's assessment that prior decisions addressing the use of the "error of judgment" instruction are "irreconcilable." Rather, I find that this Court conducted the inquiry required of it under the applicable standard of review in determining whether or not the trial court committed reversible error in formulating its jury charge based upon the facts developed in each of those cases. Specifically, we must keep in mind that our review is limited as follows:

> In reviewing a trial judge's charge, the proper test is not whether certain portions taken out of context appear erroneous. We look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not error was committed and whether that error was prejudicial to the complaining party.

Schmidt v. Boardman Co., 958 A.2d 498, 515 (Pa.Super.2008), appeal granted, —— Pa. ——, 973 A.2d 411 (2009) (quoting Reilly v. Septa, 507 Pa. 204, 231, 489 A.2d 1291, 1305 (1985)).

> We will grant a new trial based on error in the court's charge if, upon considering all the evidence of record we determine that the jury was "probably misled" by the court's instructions or that an omission from the charge amounted to "fundamental error." Price v. Guy, 558 Pa. 42, 735 A.2d 668, 671 (1999); see also Carpinet v. Mitchell, 853 A.2d 366, 371 (Pa.Super.2004). Conversely, "[a] jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations." Cruz v. Northeastern

Hosp., 801 A.2d 602, 611 (Pa.Super.2002).

In accordance with this prescription, "all issues which are relevant to pleadings and proof may become the subject of jury instructions." Carpinet, 853 A.2d at 371. Although the court's instructions "should not exclude any theory or defense that has support in the evidence," McClintock v. Works, 716 A.2d 1262, 1266 (Pa.Super.1998), the court may charge "only on the law applicable to the factual parameters of a particular case and it may not instruct the jury on inapplicable legal issues." Cruz, 801 A.2d at 611.

Betz v. Erie Ins. Exch., 957 A.2d 1244, 1260–1261 (Pa.Super.2008) (quoting Angelo v. Diamontoni, 871 A.2d 1276, 1279 (Pa.Super.2005)).

¶ 2 I acknowledge that since at least 1981, the Pennsylvania Suggested Standard Civil Jury Instructions have not included any reference to the error in judgment exception, presumably because the committee believed that the principles contained in the exception "are adequately covered by the charge on the professional standard of care." Pa.S.S.J.I. (Civ). 11.01, Note. However, these are "suggested" instructions and that same note also acknowledges that such an instruction may be appropriate in the context of the two schools of thought doctrine. Id. Nonetheless, this Court has repeatedly addressed the propriety of giving the error of judgment charge and found its application is dependent on the facts of each case as developed at trial. See King v. Stefenelli, supra, Maj. Op. n. 5.

¶ 3 In King, we found that "instructions given to a jury must be confined to the issues raised in the pleadings and the facts developed by the evidence in support of such issues." Id. 862 A.2d at 671. We determined the charge on error of judg-

ment was warranted where the testimony could support a finding that the defendant doctor made a "judgment call" in the method used to explore the abdomen to locate the source of bleeding and his decision to conclude the procedure after observing no blood flow during his 45 minutes of observation and exploration.

¶ 4 Similarly, in *Havasy v. Resnick*, 415 Pa.Super. 480, 609 A.2d 1326, 1336 (Pa.Super.1992), *appeal dismissed as improvidently granted*, 537 Pa. 114, 641 A.2d 580 (1994), we found that the "mistake of judgment" instruction was properly given when expert testimony revealed that the plaintiff's condition of compartment syndrome was difficult to diagnose early and that the signs and symptoms apparent were most likely obscured by symptoms associated with his original injury which involved serious injury to his left foot and ankle after a 600 pound metal cabinet fell from a forklift onto his leg. However, we did note that a physician is "clearly liable if his mistake reflects a failure to follow proper practice" in violation of "the standard of care required of physicians." *Id. See Blicha v. Jacks, supra* (finding jury charge on medical judgment was proper because defendant-physician exercised a medical judgment to conduct a lab test on the plaintiff rather than hospitalize him and exercised a medical judgment in his method of contacting the plaintiff about the test results); *see also Fragale v. Brigham, supra.*

¶ 5 In contrast, if the testimony presented is such that the breach of the applicable standard of care is uncontroverted, then an instruction on error of judgment would clearly be improper. For instance, in *Vallone v. Creech, supra*, this Court concluded the "mere error of judgment" charge was erroneously given. There, we found the

charge had no application because it was not supported by the evidence. Rather, the record reflected that defendant-physician knew there was a 20% chance that the plaintiff's breast cancer had reoccurred, and he failed to order any diagnostic testing including a biopsy until approximately 15 months later. We concluded this was not a "mere error of judgment" and determined that the trial court did not abuse its discretion when it concluded the confusing jury instructions warranted the grant of a new trial. *Id.* 820 A.2d at 766.

¶ 6 In the present case, we do not have a case where the breach of the standard of care is uncontroverted. The evidence at trial clearly established that Dr. Rapaport determined that this was a shoulder dystocia delivery.[1] Dr. Rapaport employed the requisite maneuvers in an attempt to dislodge the baby's shoulder from behind his mother's pubic bone. Here, Dr. Rapaport applied the McRoberts maneuver using steady firm traction without success. He then applied suprapubic pressure on the mother's abdomen but was unable to dislodge the shoulder. He then extended the episiotomy but was still unsuccessful. Finally, Dr. Rapaport was able to dislodge the impacted shoulder using the Woods or corkscrew maneuver. The delivery took between three and five minutes.

¶ 7 There was no dispute at trial that excessive traction should not be used when there is a shoulder dystocia. Appellants' expert, Dr. Finkelstein, testified that use of excessive traction is below the standard of care and can substantially increase the risk of causing an injury which can be permanent to the brachial plexus. N.T. Trial, 1/26/06, at 117. Dr. Finkelstein testified that Dr. Rapaport applied excessive

---

1. A shoulder dystocia is considered a medical emergency. N.T. Trial, 6/26/06, at 135; N.T. Trial, 6/28/06, at 90.

force or traction in his attempt to dislodge the shoulder causing the rupture of the child's C–5, C–6, C–7, and C8 nerves out of the spinal cord. *Id.* at 131, 132, 150. He also testified that this type of severe injury does not occur in the absence of negligence. *Id.* at 132. Further, Dr. Rapaport as well as his experts testified that they agreed that excessive force should not be used in a shoulder dystocia. N.T. Trial, 6/28/06, at 151, 39, 47; N.T. Trial, 6/29/06, at 23. However, they disputed that excessive force was used here. Specifically, with respect to the McRoberts maneuver, Dr. Rappaport testified that he used one slow, steady motion downward and that he held the child's head firmly so it would not slip. N.T. Trial, 6/28/06, at 134. He also testified that he applied the same traction here as in his other deliveries. *Id.* at 137. It should be noted that Dr. Finkelstein and Dr. Benedetti also agreed that a physician can do everything appropriately and still end up with a severe injury. N.T. Trial 6/26/06, at 150; N.T. Trial, 6/28/06, at 59.

¶ 8 Additionally, the expert testimony revealed that there was no way to determine when excessive force was being applied. Dr. Finkelstein testified that it is impossible to quantify how much force is being used because there is no way to measure that when a doctor is doing a delivery. N.T. Trial, 6/26/06, at 143. Further, Dr. Rapaport's expert, Dr. Benedetti, agreed that there was no way one can tell when the traction has exceeded what the nerves can handle. N.T. Trial, 6/28/06, at 45.

¶ 9 Furthermore, testimony revealed that the method of applying traction is learned in the residency program. Dr. Rapaport's testimony revealed that there is nothing written in the books about the amount of traction to be used. Rather, the attending physicians place their hands over the resident's hands. The attending physicians then apply the traction so that the residents feel how much pressure to apply. N.T. Trial, 6/28/06, at 70, 82. Dr. Benedetti agreed that every physician develops their own tactile sense of how much pressure or traction is normal. *Id.* at 37.

¶ 10 Instantly, the trial court found the mistake of judgment instruction was proper here. It determined that based upon the evidence presented, the jury could have easily concluded that Dr. Rapaport non-negligently misjudged the amount of traction he could use without injury to the child's brachial plexus. Trial Court Opinion, 12/19/06, at 4. Based upon the facts of this case and the jury instruction as a whole, I would find no error in the trial court's charge to jury. Clearly, this case involved Dr. Rapaport's judgment in the amount of traction required during the delivery of the child. Moreover, in accord with *Havasy,* the jury was also properly instructed that Dr. Rapaport could be liable for an error of judgment that was the result of negligence. *See also Schaaf v. Kaufman, supra* (finding the charge when read as a whole, accurately reflected that doctors are liable if they deviate from the standard of care, but if a judgment turns out to be wrong the doctor cannot automatically be found negligent), *appeal denied,* 582 Pa. 719, 872 A.2d 1200 (2005). Read as a whole, the charge accurately reflects that doctors are liable if they deviate from the standard of care, but if a judgment turns out to be wrong the doctor cannot automatically be found negligent. The charge required the jury to evaluate the evidence and consider whether the doctor was negligent or whether he used his best judgment at the time, exercised reasonable care, and had the requisite knowledge and skill in the care given to Mrs. Pringle even though complications arose. Accordingly, I would conclude that Appellants are not entitled to relief on this claim.

¶ 11 Furthermore, I do not believe it is this Court's responsibility, nor within its authority, to preclude the use of this instruction. Trial judges are granted wide discretion in choosing the language of their jury charge provided it portrays an accurate statement of the law. While it is true, as the majority points out, that our Supreme Court has not sustained the use. of the error of judgment charge, it is also true that our Supreme Court has never repudiated its use despite multiple opportunities to do so.[2] Quite the contrary, the Supreme Court in *Yohe, supra,* specifically lists this concept as one of the eight "well settled principles in this area of the law."

¶ 12 Specifically, the Supreme Court noted:

In considering this contention certain well settled principles in this area of the law must be kept in mind: (a) in the absence of a special contract, a physician neither warrants a cure nor guarantees the result of his treatment (*Donaldson v. Maffucci,* 397 Pa. 548, 553, 156 A.2d 835, and cases cited therein); (b) "A physician who is not a specialist is required to possess and employ in the [diagnosis and] treatment of a patient the skill and knowledge usually possessed by physicians [of good standing] in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment; and in employing the required skill and knowledge he is also required to exercise the care and judgment of a reasonable man" (*Donaldson v. Maffucci, supra,* [at] 553, 554[156 A.2d 835]); (c) the burden of proof is upon the plaintiff to prove either (1) that the physician did not possess and employ the required skill or knowledge or (2) that he did not exercise the care and judgment of a reasonable man in like circumstances (*Donaldson v. Maffucci, supra,* [at] 554[156 A.2d 835]); (d) the doctrines of res ipsa loquitur and exclusive control are not applicable in this area of the law (*Demchuk v. Bralow,* 404 Pa. 100, 104, 105, 170 A.2d 868; *Robinson v. Wirts,* 387 Pa. 291, 294, 295, 127 A.2d 706 and cases therein cited); (e) in malpractice cases which involve an appraisal of the care and skill of a physician a lay jury presumably lacks the necessary knowledge and experience to render an intelligent decision without expert testimony and must be guided by such expert testimony (*Robinson v. Wirts, supra,*[at] 292, 127 A.2d 706); (f) the only exception to the requirement that expert testimony must be produced is "where the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of even nonprofessional persons ..." (*Robinson v. Wirts, supra,* [at] 297, 127 A.2d 706); (g) a physician is not liable for an error of judgment (*Ward v. Garvin,* 328 Pa. 395, 195 A. 885; *Duckworth v. Bennett,* 320 Pa. 47, 181 A. 558; *Williams v. LeBar,* 141 Pa. 149, 21 A. 525); (h) if a physician employs the required judgment and care in arriving at his diagnosis, the mere fact that he erred in his diagnosis will not render him liable, even though his treatment is not proper for the condition that actually exists (*Richards v. Willard,* 176 Pa. 181, 35 A. 114 (fracture as a sprain)); *Duckworth v. Bennett, supra* (fracture as arthritis);

2. I would point out that in each of the panel decisions of this Court cited by the majority (*D'Orazio, Vallone, Gunn, Havasy, Schaaf, Fragale,* and *Soda)* whether we affirmed the use of the instruction or affirmed the trial court's refusal to give the instruction, our Supreme Court denied allowance of appeal or dismissed the appeal as improvidently granted.

*Ward v. Garvin, supra* (wrong diagnosis of injury to foot).

*Yohe,* 412 Pa. at 98–100, 194 A.2d at 170. Rather, I believe such a preclusive ruling, even if this Court deems it desirable, must await our Supreme Court's examination of the viability of its continued use. Given the fact that both this Court and our Supreme Court have viewed this instruction as a viable principle of law in medical malpractice cases, I believe it is incumbent upon our Supreme Court to settle any confusion as to its proper use. *See Jones v. Chidester, supra,* Maj. Op. n. 5, (wherein our Supreme Court reexamined the "two schools of thought" doctrine in the context of the appropriate instruction to be given to a jury due to the confusion between the appellate courts as to the proper test to determine whether a school of thought qualifies).

¶ 13 As to Appellants' second issue, I would likewise find no abuse of discretion by the trial court in giving the "guarantor of a cure" instruction. It is well settled that the "guarantor of a cure" instruction is an accurate statement of the law. *See Havasy,* 609 A.2d at 1335–1336 (stating, "The trial court did not err when it instructed the jury that a physician does not guarantee a cure and that negligence should not be presumed from the occurrence of an unfortunate result. These are accurate statements of the law and do not contradict or confuse the instruction on increased risk of harm."). Appellants have cited to no authority to support their claim that such a charge cannot be given when a plaintiff is proceeding under a theory of *res ipsa loquitur.*

¶ 14 In finding the charge was properly given, the trial court stated:

This case turned on whether the jury believed Dr. Finkelstein's testimony that the tearing of the brachial plexus could only have occurred if Dr. Rapaport negligently applied excessive traction, or Dr. Benedetti's testimony to the contrary. The charge correctly described the legal principles applicable to the dispute by explaining to the jury that they should find for the plaintiffs if they believed that the harm involved is of the kind that ordinarily does not occur in the absence of negligence, but that negligence should not be presumed just from the occurrence of an unfortunate result.

Trial Court Opinion, 12/19/06, at 5. Upon my review, I find no abuse of discretion and would, therefore, affirm the judgment. Accordingly, I must respectfully dissent.