Steven P. PASSARELLO, Administrator of the Estate of Anthony J. Passarello, Deceased, Steven P. Passarello and Nicole M. Passarello, Husband and Wife, Appellants

v.

Rowena T. GRUMBINE, M.D. and Blair Medical Associates, Inc., Appellees.

Superior Court of Pennsylvania.

Argued June 22, 2011.

Filed Sept. 9, 2011.

Reargument Denied Nov. 10, 2011.

Donald J. Feinberg, Philadelphia, for appellants.

John W. Jordan, IV, Pittsburgh, for Blair, appellee.

Lynn E. Bell, Pittsburgh, for Grumbine, appellee.

BEFORE: FORD ELLIOTT, P.J.E., BENDER and STRASSBURGER *, JJ.

OPINION BY BENDER, J.:

Steven T. Passarello, Administrator of the Estate of Anthony J. Passarello, Deceased, and Steven T. Passarello and Nicole M. Passarello, Husband and Wife, (collectively, "the Passarellos"), appeal from the judgment entered in favor of Rowena T. Grumbine, M.D., and Blair Medical Associates, Inc. The Passarellos contend that they should be accorded the benefit of this Court's holding in *Pringle v. Rapaport*, 980 A.2d 159 (Pa.Super.2009), which abrogated the former "error in judgment rule" as a defense in medical malpractice cases. Following a review of the effect of *Pringle's* holding on litigation pending at the time that decision was filed, we conclude that the circumstances of this case, coupled with defense counsel's heavy reliance on the "error in judgment rule" at trial, compel the award of a new trial. Accordingly, we vacate the judgment entered in the trial court with direction to convene a new trial.

This matter arose out of the death of two-month-old Anthony Passarello, who died while under the care of defendant pediatrician Rowena T. Grumbine, M.D., and members of her staff at Blair Medical Associates, Inc. Anthony's parents, Stephen and Nicole Passarello, brought Anthony to Dr. Grumbine for multiple visits following his birth on May 31, 2001, and contacted Dr. Grumbine's office seven times during the week preceding his death on August 4, 2001. The relevant chronology of that final week appears in the record as follows.

On July 27, the Passarellos brought Anthony to Dr. Grumbine's office concerned about the state of his health, reporting that he would take only 4 ounces of formula rather than the customary 6 or 7, that he was crying after feedings, and that he had a slight cough.

On July 29, the Passarellos called Blair Medical Associates' "tele-a-nurse" phone service and reported that Anthony had experienced projectile vomiting, had been

---

* Retired Senior Judge Assigned to the Superior Court.

fussy for the previous five days, and was tired after feeding. They reported those same symptoms later that day when they spoke with Dr. Grumbine by telephone. Dr. Grumbine suggested that time that Anthony might suffer from pyloric stenosis and noted that a barium swallow test might be indicated. However, subsequent developments discounted that potential diagnosis and Dr. Grumbine did not order the test.

On July 30, the Passarellos took Anthony for an office visit with Dr. Grumbine and reported that Anthony continued to have a slight cough and had vomited two to three times daily for the preceding four to five days.

Two days later, on August 1, during a follow-up office visit with Dr. Grumbine, the Passarellos reported that Anthony was fussy, vomiting at times, was not sleeping, exhibited pain while feeding, and was wheezy afterward. Dr. Grumbine found Anthony's symptoms consistent with gastroesophogeal reflux and prescribed medications to treat that condition. She also immunized him for DPT, Polio, Haemophilus Influenza Type B, Hepatitis B, and Pneumococcus.

Thereafter, on August 2, the Passarellos called the tele-a-nurse service and reported that Anthony's formula consumption had dropped to three ounces that day, that he was fussy and not sleeping, and was screaming as if in pain. They also reported that he had wet only two diapers that day and had a fever of 101°F despite administration of Tylenol every four hours. Dr. Grumbine found Anthony's symptoms consistent with reactions to his immunizations of the previous day and concluded that he might also be in pain from acid reflux.

Anthony's symptoms remained unabated and on the following day, August 3, the Passarellos took him to the emergency room at Altoona Hospital, where the attending physician, Dr. Holly Thompson, found him to be in severe respiratory distress and confirmed that his heart rate had fallen dangerously low. Despite intubation and the use of a ventilator as well as other supportive measures, Anthony died during the early morning hours of August 4. Postmortem examination established the cause of death to be diffuse acute viral myocarditis, a viral infection of the heart muscle.

The Passarellos commenced this action by complaint on July 28, 2003, and the case remained in litigation until entry of the defense verdict on April 29, 2009. Following presentation of the evidence, the trial court charged the jury on the objective standard of professional negligence, but also instructed on Blair Medical's Point for Charge # 7, which encapsulated the "error in judgment" doctrine as follows:

> In medical negligence cases there is no presumption of or inference of negligence merely because of an unfortunate result which might have occurred despite the exercise of reasonable care. *Under the law physicians are permitted a broad range of judgment in their professional duties and physicians are not liable for errors of judgment unless it's proven that an error of judgment was the result of negligence.* And again[,] all the other points are accurate statements of law but I feel I've covered them.

N.T., Judge's Charge, 4/27/09, at 35–36. Counsel for Dr. Grumbine had also emphasized the error in judgment doctrine in her argument. The following excerpt repeats counsel's language, but only partially captures the extent to which her closing argument relied on the doctrine:

> Now, every physician must use clinical judgment. You don't practice medicine by textbook. There's no guideline that you can go to. You don't have some-

thing on your blackberry[;] well there's this symptom and that symptom so we're gonna do this. They have to make decisions. A physician cannot warrant care and they cannot guarantee outcomes because of the uniqueness of treating human beings. To require otherwise, to require physicians to be perfect is an impossible burden and we— the law recognizes [sic] we will not do that. When you look at Dr. Grumbine's judgments were they careless, were they unskilled? When you come to the key issue of the August 2 telephone call she had to use her judgment and if her judgment was reasonable then she was not careless and she was not unskilled.

N.T., Attorney Bell's Closing Argument, 4/27/09, at 3–4. After arguing the inferences the jury should draw from the evidence and the extent to which they indicated that Dr. Grumbine was "careless," counsel wove the concept into her argument concerning the physician's judgment:

> So the question for you in answering that first question was Dr. Grumbine careless or unskilled in making a clinical judgment that those symptoms [—] the very symptoms that are published by the Department of Health and Human Services and side effects from DPT that that's what those symptoms were due to.

*Id.* at 13. Following the closings of counsel for the remaining parties and extended deliberation, the jury returned the defense verdict at issue here.

The Passarellos filed a motion for post-trial relief requesting, *inter alia*, a new trial on the basis of the error in judgment charge. Following an extended transcription and briefing schedule, the court denied the Passarellos' motion by order of August 24, 2010, and entered judgment on the verdict on September 7, 2010. The Passarellos then filed this appeal, raising

the following question for our consideration:

> Whether the trial court's inclusion of the "error in judgment instruction in its jury charge had a tendency to mislead or confuse the jury by injecting a subjective element into the jury's deliberation involving Dr. Grumbine's state of mind even though her mental state is irrelevant in determining whether she violated the objective, applicable standard of care and/or whether the inclusion of the "error in judgment" charge wrongly suggests to the jury that a physician is not culpable for the negligent exercise of her judgment[?]

Brief for Appellant at 4.

▉▉▉▉ Again on appeal, the Passarellos seek the award of a new trial.

> Consideration of all new trial claims is grounded firmly in the harmless error doctrine "[which] underlies every decision to grant or deny a new trial. A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Harman ex rel. Harman v. Borah*, 562 Pa. 455, 756 A.2d 1116, 1122 (2000). Once the trial court passes on the moving party's claim, the scope and standard of appellate review coalesce in relation to the reasons the trial court stated for the action it took. *See id.* Where the court is presented with a finite set of reasons supporting or opposing its disposition and the court limits its ruling by reference to those same reasons, our scope of review is similarly limited. *See id.* at 1123. Thus, "[w]here the trial court articulates a single mistake (or a finite set of mistakes), the appellate court's review is limited in scope to the stated reason, and the ap-

pellate court must review that reason under the appropriate standard." *Id.* (quoting *Morrison v. Com., Dept. of Pub. Welfare,* 538 Pa. 122, 646 A.2d 565, 571 (1994)). Our standard of review prescribes the degree of scrutiny we apply to the trial court's decision and the manner in which we evaluate its conclusions. *See id.* at 1122 (citing *Morrison,* 646 A.2d at 570). If the trial court's challenged ruling was one of law, we review its grant or denial of a new trial on that point to discern if the court committed legal error. *See id.* at 1123. Similarly, if the challenged ruling involved a discretionary act, we review the disposition of the new trial motion relative to that act for abuse of discretion. *See id.* "Discretion must be exercised on the foundation of reason." *Id.* Accordingly,

> [a]n abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. A finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion.

*Id.* (quoting *Morrison,* 646 A.2d at 570). "Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion." *Id.*

*Rettger v. UPMC Shadyside,* 991 A.2d 915, 923–924 (Pa.Super.2010).

In support of their question, the Passarellos contend that the trial court erred in charging the jury on the "error in judgment" rule, *i.e.,* "[u]nder the law physicians are permitted a broad range of judgment in their professional duties and physicians are not liable for errors of judgment unless it's proven that an error of judgment was the result of negligence." Brief for Appellant at 11. Relying on *Pringle,* the Passarellos contend that the "error in judgment" charge "wrongly suggests to the jury that a physician is not culpable for one type of negligence, namely the negligent exercise of her judgment." *Id.* (quoting *Pringle,* 980 A.2d at 173). They argue further that the instruction "wrongly injects a subjective element into the jury's deliberations when the standard of care for physicians is objective in nature." *Id.* (citing *Pringle,* 980 A.2d at 174). Following careful consideration of the Passarellos' arguments, as well as the respective responses of the Defendants, we conclude that the use of an error in judgment charge in this case did run afoul of the principles enunciated in *Pringle.*[1]

 As a threshold matter, we acknowledge the argument posited on behalf of Dr. Grumbine and Blair Medical Associates that the holding in *Pringle* should not be applied here, as the decision was not filed of record until August 31, 2009, some four months after the jury in this case reached a verdict. We do not find the date of publication in *Pringle* to be legally controlling. Although *Pringle* was not released

---

1. In their respective appellee briefs, Dr. Grumbine and Blair Medical Associates argue that the Passarellos waived their challenge to the trial court's application of the "error in judgment" rule, as their counsel objected only to the formulation of the concept that appeared in Dr. Grumbine's points for charge. The Passarellos did not object to the language used in Blair Medical's points. Having considered the record closely, we do not find the Passarellos' failure to object to one of the two formulations of the defendants' points for charge tantamount to waiver. The Passarellos' objection to Dr. Grumbine's formulation of the rule allowed the trial court an opportunity to assess its use of the instruction. Therefore, it adequately preserves the related claim of error as to both defendants.

into the public domain until after the jury had reached its verdict here, this case remained in litigation, pre-judgment, as the Passarellos awaited disposition of their post-trial motion and both parties awaited transcription of the record. In point of fact, the trial court did not enter judgment on the verdict until September 7, 2010, more than a full year after publication of the decision in *Pringle.*

■ "The general rule followed in Pennsylvania is that we apply the law in effect at the time of the appellate decision..... This means that we adhere to the principle that, 'a party whose case is pending on direct appeal is entitled to the benefit of changes in law which occurs before the judgment becomes final.'" *Blackwell v. State Ethics Commission,* 527 Pa. 172, 589 A.2d 1094, 1099 (1991) (*overruled on other grounds, Bugosh v. I.U. North America, Inc.,* 601 Pa. 277, 971 A.2d 1228 (2009)). *See also Davis v. Government Employees Ins. Co.,* 775 A.2d 871, 874–75 (Pa.Super.2001) (recognizing that Pennsylvania follows the rule that normally an appellate court decision announcing a rule of law will apply to the case in which it is announced and to all pending cases). Application of such a decision to cases still pending is considered retroactive and generally occurs as a matter of course. *See Blackwell,* 589 A.2d at 1099. Where the decision announces a new rule of law, however, the court is vested with discretion to limit its effect on a case by case basis.[2] In such an instance, "the decision of whether to apply the new rule retroactively or prospectively is a function of several considerations: the purpose to be served by the new rule, the extent of the reliance on the old rule, and the effect on the administration of justice by the retroactive applica-

tion of the new rule." *See id. See also Bugosh,* 971 A.2d at 1243 n. 25 (citing *Blackwell,* 589 A.2d at 1100) ("[T]he standard adopted by this Court considers: whether the decision establishes a new principle of law; the merits by reviewing the history of the rule in question, its purpose and effect, and the potential impact of retroactive effect on its application; and the equities involved.").

■ In this instance, we find no impediment to retroactive application of the holding in *Pringle.* In that case, this Court, sitting *en banc,* explored the history of the error in judgment rule and precluded its continued use in Pennsylvania on the basis of its inconsistency with the "standard of care" analysis on which liability in professional negligence cases depends. *See Pringle,* 980 A.2d at 173–74 ("The 'error of judgment' instruction neither defines nor clarifies the applicable standard of care, and may likely mislead the jury during its deliberations."). In nullifying the error in judgment rule, we offered the following analysis:

First, the "error of judgment" charge wrongly suggests to the jury that a physician is not culpable for one type of negligence, namely the negligent exercise of his or her judgment. This is simply untrue, since in all medical malpractice actions "[t]he proper focus is whether the physician's conduct (be it an action, a judgment, or a decision) was within the standard of care." If, on one hand, a physician's conduct violates the standard of care, then he or she is negligent regardless of the nature of the conduct at issue. If, on the other hand, a physician's conduct does not violate the standard of care, then he or she has not, by definition, committed any culpa-

---

**2.** "A new rule of law is established where an abrupt and fundamental shift from prior precedent, upon which litigants may have relied,

has occurred." *Office of Disciplinary Counsel v. Surrick,* 561 Pa. 167, 749 A.2d 441, 444 (2000) (citations omitted).

ble error of judgment. As such, after a jury has been charged on the fundamental principles regarding a physician's standard of care, adding an "error of judgment" instruction only confuses, and does not clarify, the determinative issue regarding deviation from the standard of care.

Second, the "error of judgment" charge wrongly injects a subjective element into the jury's deliberations. The standard of care for physicians in Pennsylvania is objective in nature, as it centers on the knowledge, skill, and care normally possessed and exercised in the medical profession. The "error of judgment" charge improperly refocuses the jury's attention on the physician's state of mind at the time of treatment, even though the physician's mental state is irrelevant in determining whether he or she deviated from the standard of care. Furthermore, by directing the jury's attention to what the physician may have been thinking while treating the patient, *the jury may also be led to conclude that only judgments made in bad faith are culpable*—even though a doctor's subjective intentions while rendering treatment are likewise irrelevant to the issues placed before a jury in a medical malpractice case.

*Id.* (emphasis added, footnote and citations omitted).

Reviewing the genesis and history of the rule, we confirmed that panels of this Court had both approved and disapproved use of the error in judgment charge under circumstances that rendered the holdings in those cases irreconcilable. *See id.* ("These irreconcilable decisions of this Court leave the state of the law regarding 'error of judgment' instructions in flux, as it would appear that trial courts are routinely affirmed whether they do, or do not, include the instruction in jury charges....

These conflicting decisions provide little or no guidance to trial courts and litigants...."). We also recognized that the error in judgment instruction had been disapproved by the Committee on Proposed Standard Civil Jury Instructions, appointed by the Pennsylvania Supreme Court, as long ago as 1981. Consequently, the Committee had intentionally omitted the instruction from the 1981, 2003, and 2009 versions of the Suggested Standard Jury Instructions based on the following rationale:

There is no reference to a physician's "judgment" in this instruction for the following reasons.... The focus, under Pennsylvania law, is on whether the physician's conduct comported to the requisite standard of care. Simply put, if a physician does not 'exercise reasonable care,' that physician will not be insulated from liability based on the fact that this failure constituted a 'mere error in judgment,' or what he or she thought 'best after a careful examination.' Conversely, if a physician does 'exercise reasonable care,' that physician will generally not be liable, notwithstanding that he or she committed a 'mere error in judgment,' or failed to do what he or she thought 'best after a careful examination.' In either case, such factors are but elements of the overarching concept of due care. Clearly, the use of phrases regarding mistakes or errors in judgment, best judgment, and the like, in the decisional law of this Commonwealth, are meant to help illustrate the parameters of the standard of care of physicians, and are not meant to pose additional requirements for defendants, on one hand, or to undermine the bedrock 'reasonable care' requirement on the other. However, the inclusion of such phrases in jury instructions seems unlikely to serve that purpose. To the contrary, such phrases,

at worst, risk misstating the law. At best, they seem unnecessarily circular in form. In any event, such language seems far more likely to mislead and confuse the jury rather than to enlighten it.

See id. (quoting Pa.SSJI (Civ) 11.01(2009) (Subcommittee Note) (internal citations omitted)). See also Pa.SSJI 10.03A (2003); 10.03A (1981).

As revealed by both the Committee note and our own analysis in *Pringle* concerning the state of the law, consensus surrounding the use of the error in judgment charge has been far from universal. Our Supreme Court never adopted the standard; moreover, its application among our trial courts was irregular and our own treatment of it inconsistent. See *Pringle*, 980 A.2d at 173–74. Thus, assuming that our holding in *Pringle* constituted adoption of a new rule of law (which is by no means certain, see fn. 1, *infra*), we are constrained to recognize that the circumstances relevant to retroactive application of the decision preponderate in favor of such application. We note initially, that "the extent of the reliance on the old rule," *i.e.*, the error in judgment rule, although apparent in *this case*, has been no more uniform than this Court's related jurisprudence. See *Blackwell*, 589 A.2d at 1100; *Pringle*, 980 A.2d at 173–74 ("[I]t would appear that trial courts are routinely affirmed whether they do, or do not, include the instruction in jury charges."). Consequently, the purpose of *Pringle's* holding, which clarifies the burden of proof in medical malpractice cases, abrogates inconsistent decisions, and harmonizes the remaining cases, is unquestionably salutary. See *Blackwell*, 589 A.2d at 1100. Although application of *Pringle's* holding here potentially subjects the parties to the rigors of a new trial, *Pringle's* effect on the broader administration of justice is limited to those cases in which final judgment had not been entered before the filing date of the *en banc* panel's Opinion. That effect is further attenuated by the fact that to avail themselves of the clarification the Opinion announces, appellants must have preserved a challenge to the error in judgment rule by the usual means—including objection coupled with an appropriate request for relief from the trial judge, a motion for post-trial relief pursuant to Pa. R.C.P. 227.1, inclusion in a Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(b), and appropriate discussion, citation, and analysis in an appellate brief pursuant to Pa.R.A.P. 2119(a)-(e). By no means can we conclude that the number of such cases will be overwhelming. Thus, the holding in *Pringle* can, and must, be applied retroactively.

■ Applying the *Pringle* decision here, we conclude that the award of a new trial is imperative. In *Pringle*, the trial court first charged the jury on Pennsylvania's objective standard of care in medical malpractice cases, but then instructed the jury on the effect of a physician's "error in judgment." Suggesting that the physician's commission of an error in judgment might somehow attenuate the usual objective standard of care, the instruction gave every indication that a physician may avoid liability for otherwise negligent acts if at the time in question he had done the best he could. That instruction follows, in pertinent part:

> Folks, if a physician has used his best judgment and he has exercised reasonable care and he has the requisite knowledge or ability, even though complications resulted, then the physician is not responsible, or not negligent. The rule requiring a physician to use his best judgment does not make a physician liable for a mere error in judgment pro-

vided he does what he thinks best after careful examination.

* * * *

Physicians who exercise the skill, knowledge and care customarily exercised in their profession are not liable for a mere mistake of judgment. *Under the law, physicians are permitted a broad range of judgment in their professional duties, and they are not liable for errors of judgments unless it is proven that an error of judgment was the result of negligence.* And folks, as a general proposition that applies in any case, doctors or physicians do not guarantee a cure to their patients, and negligence should not be presumed from the occurrence of an unfortunate result.

*Pringle,* 980 A.2d at 164 (emphasis added). Similarly in this case, the trial court instructed the jury on Pennsylvania's objective standard of care, but then, at the request of counsel for Dr. Grumbine, gave the following instructions:

Now, I've been given points of law by counsel. Some of these points, most of the points frankly I've—I've already covered and I'm gonna cover the points that counsel has given me where I—I conclude that they ... are essential to their theory and are a proper statement of law.

N.T., 4/27/09, at 30.

In medical negligence cases there is no presumption of or inference of negligence merely because of an unfortunate result which might have occurred despite the exercise of reasonable care. *Under the law physicians are permitted a broad range of judgment in their professional duties and physicians are not liable for errors of judgment unless it's proven that an error of judgment was the result of negligence.* And again all

the other points are accurate statements of law but I feel I've covered them. *Id.* at 372–73 (emphasis added).

Significantly, the respective trial courts in both cases charged on the same formulation of the error in judgment rule, noting that "physicians are not liable for errors of judgment." Although the court in this case did not use the more extensive language that appears in *Pringle,* in which the trial court instructed that the law "does not make a physician liable for a mere error in judgment provided [the physician] does what he thinks best," the court's charge nevertheless introduced Dr. Grumbine's state of mind as an element for the jury's consideration. In so doing, the charge attenuated the objective standard of care imposed by Pennsylvania law and obfuscated the manner in which the jury might properly weigh the evidence. Whereas the law allows only consideration of whether the care a physician rendered fell below the standard of care established by expert testimony, the court's instruction allowed the jury to weight the subjective state of mind with which Dr. Grumbine undertook her treatment of baby Anthony Passarello. Dr. Grumbine's counsel, fully aware that the error in judgment instruction would be given, primed the jury to receive it by repeatedly emphasizing the role of judgment in a physician's decision-making process. In addition, and perhaps more consequentially, counsel focused the jury's attention on Dr. Grumbine's subjective state of mind, casting her conduct during the requisite period as a matter of whether she had behaved conscientiously, *i.e.,* whether she did her best. In so doing, counsel used the error in judgment rule not as a measure of whether Dr. Grumbine deviated from the standard of care in any specific act or omission, but as a measure of Dr. Grumbine's character as a professional. The following excerpt, de-

spite—or perhaps because of—its length, is especially illustrative:

When we talk about the facts, what I want to do is give you some parameters of the choices that you will be asked to make. You're gonna be given a verdict slip and on that slip is a set of three questions that you will be asked to answer. The first question, do you find that the Defendant Rowena Grumbine, M.D. was negligent? Now what does that mean? Well what the judge will tell you when you talk about negligence[,] the issue is was she careless or was she unskilled in the care that she rendered or the decisions that she made? So you must ask yourself does a careless doctor spend 15 to 20 minutes on the phone with concerned parents on a Sunday? Does a careless doctor make special arrangements on a Monday morning before her office is even open, before nurses are even in the office[,] to see a child when a parent has concerns? Does a concerned or careless doctor sit there for an hour and actually watch the child eat? Does a careless doctor then make an unsolicited phone call to the house the next day just to see how he's doing? Does that same careless doctor then spend an hour on Wednesday during a well-baby visit when the child is well? And does a careless doctor spend three—30 to 40 minutes on the phone with parents the day after immunizations are given and then make another unsolicited phone call on Saturday[,] her day off[,] in the middle of her three day weekend off[,] to see how the child is doing? These facts show she—one thing she's attentive and she was conscientious. She ordered tests when she thought they were indicated. She made referral to the pediatric specialist when it was indicated.

Now every physician must use clinical judgment. You don't practice medicine by textbook. There's no guideline that you can go to. You don't have something on your blackberry well there's this symptom and this symptom so we're gonna do this. They have to make decisions. A physician cannot warrant care and they cannot guarantee outcomes because of the uniqueness of treating human beings. To require otherwise, to require physicians to be perfect[,] is an impossible burden and we—the law recognizes that we will not do that. When you look at Dr. Grumbine's judgments were they careless, were they unskilled? When you come to the key issue, the August 2 phone call she had to use her judgment and if her judgment was reasonable then she was not careless and she was not unskilled.

N.T., Attorney Bell's Closing Argument, 4/27/09, at 2–4.

What counsel's argument skillfully suggests is that regardless of the objective standard of care, Dr. Grumbine, in an exercise of continued self-sacrifice, acted with the best of intentions and made judgments for which she could not be faulted, in part because they *were* judgments and a physician cannot warrant care. *Id.* Although we might otherwise recognize such commentary as a manifestation of the broad license counsel enjoys to argue the evidence, in this case, where that argument exploits an erroneous instruction, we cannot minimize the underlying error. Although, as we noted, the language the court used here is not as extensive as that employed by the court in *Pringle,* counsel's argument effectively magnified the error, rendering the resulting verdict as likely the result of the incorrect charge as any we can conceive.

Under these circumstances, we cannot deem the court's error harmless. As we have noted, the award of a new trial must

be premised on a finding that error in the conduct of the trial prejudiced the defendant by materially affecting the outcome of the case. In this case, we find that benchmark satisfied. Our holding in *Pringle,* which should have been applied in this case, disavowed the very argument that counsel made. Nevertheless, the trial court's charge effectively insulated that argument, potentially confused the jury, and placed the plaintiffs at a disadvantage unrelated to the quality or quantity of the evidence they adduced. Under these circumstances, we find the prejudice inherent in the court's error to be clear.

Accordingly, we vacate the judgment of the trial court and remand this matter for a new trial.

Judgment **VACATED.** Case **RE-MANDED** for a new trial. Jurisdiction **RELINQUISHED.**