Kathleen BUCKMAN and
Michael Buckman

v.

Gary VERAZIN, M.D.; Wyoming Valley Surgical Associates; Joseph Ridilla, D.O.; Joseph J. Ridilla, D.O., P.C.; Wyoming Valley Healthcare System, Inc., Wilkes–Barre General Hospital.

Appeal of Gary Verazin, M.D., and Wyoming Valley Surgical Associates.

Kathleen Buckman and
Michael Buckman

v.

Gary Verazin, M.D.; Wyoming Valley Surgical Associates; Joseph Ridilla, D.O.; Joseph J. Ridilla, D.O., P.C.; Wyoming Valley Healthcare System, Inc., Wilkes–Barre General Hospital.

Appeal of Wyoming Valley Health Care System, Inc. & WVHCS–Hospital d/b/a Wilkes–Barre General Hospital, Appellant.

Superior Court of Pennsylvania.

Argued Aug. 22, 2012.
Filed Oct. 5, 2012.

Maureen M. McBride, West Chester, for Verazin and Wyoming Valley Surgical Associates.

William J. Aquilino, Scranton, for Wyoming Valley Health Care & WVHCS.

Roberta A. Golden, for Buckman, Kathleen & Michael.

BEFORE: STEVENS, P.J., BENDER, J. and GANTMAN, J.

OPINION BY BENDER, J.:

Gary Verazin, M.D. ("Dr. Verazin"), Wyoming Valley Surgical Associates, Wyoming Valley Health System, Inc. ("Health

System"), and Wilkes–Barre General Hospital ("Hospital") (collectively "Appellants") appeal from the order entered on December 20, 2011, that granted the motion for reconsideration filed by Kathleen Buckman and Michael Buckman (the "Buckmans"), and directed that their discovery requests in this medical malpractice case be granted. Specifically, the court's order directed *inter alia* that Appellants produce "all operative notes, redacted for patient names/medical record number, for all sigmoid colectomy and/or lower anterior resection procedures done in the past five (5) years before January 11, 2008 by Gary Verazin, M.D." Trial Court Order, 12/20/11, at ¶ 1. We reverse.

This litigation arose after Dr. Verazin performed a sigmoid colectomy and colostomy on Mrs. Buckman on January 11, 2008. The Buckmans alleged medical negligence against Appellants as a result of the care Mrs. Buckman received. With regard to the depositions taken of Dr. Verazin and a portion of the procedural history of this matter, the trial court stated:

> The [d]eposition of Dr. Verazin was started on July 7, 2011 and completed on December 13, 2011. Dr. Verazin testified on December 13, 2011 that he conducted the surgery in the manner in which he did due to the size of Mrs. Buckman's rectum. The Doctor stated that he had to tailor the surgery to perform the anastomosis based on the fact that Mrs. Buckman had the nature of a rectum and a very shortened mesentery proximably [sic] from her disease which made mobilizing the proximal bowel very difficult. Dr. Verazin then testified that he did the procedure in the manner which he did it because of her unique physique but that the procedure he utilized was a well[ ]known technique that can be used and should be in a surgeon's armamentarium when con-

fronted with a difficult anatomy and colon surgery. This Court finds credible evidence substantiating that a similar line of question was explored during the July 7, 2011 deposition and that Dr. Verazin did not mention that Mrs. Buckman had a unique anatomy.

> After the July 7, 2011 deposition of Dr. Verazin, the [Buckmans] served defendants Wyoming Valley Health Care System, Inc. and Wilkes–Barre General Hospital with a Second Supplemental Request for Production of Documents on August 11, 2011 requesting additional information as well as the medical records of all sigmoid colectomy and/or anterior resection procedures conducted by Dr. Verazin in the five (5) years prior to January 11, 2008 and all of Dr. Verazin's surgical records of January 11, 2008. Wyoming Valley Health Care System, Inc. and Wilkes–Barre General Hospital provided their responses to the Second Supplemental Request for Production of Documents on September 9, 2011, but objected to requests pertaining to the five (5) prior year surgical records of Dr. Verazin as well as the January 11, 2008 records asserting that the information sought is protected health information. On September 11, 2011 the [Buckmans] directed a letter to the [Appellants] reiterating that the requests directed that all information which identified patients was to be redacted.

> On November 2, 2011 the [Buckmans] filed a Motion to Compel the [Appellants] to produce documents in response to the Second Supplemental Request for Production of Documents filed by the [Buckmans]. The [Buckmans] argued that the five (5) prior years of surgical records are necessary to determine Dr. Verazin's experience with the specific procedure at issue as well as his tech-

nique in performing the surgery as the [Buckmans] allege Dr. Verazin's technique was negligence. The [Buckmans] further argued that all of Dr. Verazin's surgical records from January 11, 2008 are discoverable asserting that the time line of events of that day are at issue in the case.

Trial Court Opinion (T.C.O.), 2/27/12, at 1–2.

Following Appellants' response and oral argument, the Honorable Lewis Wetzel denied the Buckmans' motion to compel. However, after the completion of Dr. Verazin's deposition on December 13, 2011, the Buckmans requested reconsideration, which Judge Wetzel granted. Specifically, on December 20, 2011, Judge Wetzel granted the Buckmans' motion to compel "limiting the scope of the information produced ... pursuant [to] 45 C.F.R. § 164.512(a)." T.C.O. at 3. Appellants then requested certification for an interlocutory appeal; however, Judge Wetzel denied that request as well as Appellants' emergency petition to stay the December 20, 2011 order.

Appellants filed the instant appeal. On February 2, 2012, this Court entered a temporary stay of the December 20th order and directed the trial court to provide its reasoning for issuing its order requiring Appellants to produce the information requested and its reasoning for refusing to grant certification for an interlocutory appeal and a stay during the pendency of the appeal. On February 27, 2012, the Honorable Lesa S. Gelb[1] issued an opinion in response to this Court's February 2nd order. In the opinion, Judge Gelb attempts to provide a basis for Judge Wetzel's orders and explains that "the information requested by the [Buckmans] applies di-

rectly to the allegations set forth in [their complaint] in addition to permitting the [Buckmans] an opportunity to examine the inconsistent testimony of Dr. Verazin." T.C.O. at 7. Judge Gelb also discussed the Health Insurance Portability and Accountability Act of 1996 (HIPAA), concluding that Judge Wetzel's December 20, 2011 order complied with the federal mandate. Then, by order dated March 9, 2012, this Court extended the stay until our decision on the merits is reached.

■ We begin our review by recognizing that the December 20, 2011 order involving discovery is not a final order and, therefore, not appealable. *See Jones v. Faust*, 852 A.2d 1201, 1203 (Pa.Super.2004) (stating, "in general, discovery orders are not final, and are therefore unappeable"). However, such an order is appealable under Pa.R.A.P. 313(b) as a collateral order. *Id.* Rule 313(b) states: "A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." As in *Jones*, the discovery order here compels the production of private and confidential medical information of non-parties and "once disclosed, the confidentiality attaching to this information is lost." *Id.* Accordingly, we conclude that the discovery order involved in this case is appealable as a collateral order; thus, we now turn to the issues raised by the Appellants.

On appeal, Dr. Verazin states his issue as follows:

Whether the trial court erred in ordering production of Dr. Verazin's third

1. This case was reassigned from Judge Wetzel to Judge Gelb when Judge Wetzel's term in office expired on January 2, 2012.

party patients['] operative notes in circumstances where: (i) the requested information clearly is highly embarrassing, privileged and protected from discovery by federal and state law; (ii) the records are not sought to prove, nor probative of [the Buckmans'] theory that Dr. Verazin provided negligent medical care to [Mrs. Buckman;] and (iii) [the Buckmans'] theory that the patient records in question are necessary to impeach Dr. Verazin is completely collateral to [the Buckmans'] theory of relief and wholly unsupported by the record[?]

Dr. Verazin's brief at 5. The Health System and Hospital raise a similar issue, although they state it somewhat differently:

Must private and privileged medical records of non-party patients be produced in discovery where:

A. The patients have not consented to release?

B. The claim sounds in tort only (medical negligence)?

C. Disclosure violates the physician-patient privilege codified at 42 Pa. C.S.A. § 5929?

D. Disclosure violates the right to privacy guaranteed by the Pennsylvania Constitution?

Health System's and Hospital's brief at 3.

■ Because the issues raised concern an evidentiary ruling by the trial court, we are guided by the following:

Generally, an appellate court's standard of review of a trial court's evidentiary rulings is whether the trial court abused its discretion; however, where the evidentiary ruling turns on a question of law our review is plenary.

*Dodson v. Deleo,* 872 A.2d 1237, 1241 (Pa.Super.2005) (quoting *Zieber v. Bogert,* 565 Pa. 376, 773 A.2d 758, 761 n. 3 (2001)).

Initially, Dr. Verazin asserts that the information the Buckmans seek is "confidential and protected from discovery as a matter of law by the United States and Pennsylvania Constitutions, HIPAA, Pennsylvania common law, and the physician-patient privilege." Dr. Verazin's brief at 11. Specifically, Dr. Verazin contends that the information sought by the Buckmans is confidential under 28 Pa.Code § 115.27 and that "the substance of the information contained [in the records] to the extent it involves communication between Dr. Verazin and his patients—is protected by the physician-patient privilege[.]" *Id.* at 12 (citing *In re June 1979 Allegheny Cty. Investigating Grand Jury,* 490 Pa. 143, 415 A.2d 73 (1980)).

■ The doctor also contends that the requested records are not relevant to the Buckmans' negligence and loss of consortium claims. Dr. Verazin's brief at 14. The doctor sets forth the elements of a negligence claim[2] and also notes that "medical malpractice is further defined as the 'unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient.'" *Id.* (quoting *Toogood v. J. Rogal, D.D.S., P.C.,* 573 Pa. 245, 824 A.2d 1140, 1145 (2003)). Based upon this statement of the law, Dr. Verazin posits that other patient records do not establish Mrs. Buckman's damages, and the breach of the doctor's duty to her. Moreover, the doctor contends that the causation element must be proven through expert testimony and that other patients'

2. A medical malpractice claim alleging negligence is established by proving: "(1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages." *Grossman v. Barke,* 868 A.2d 561 (Pa.Super.2005).

medical records are not probative of the alleged negligence connected to the doctor's care of Mrs. Buckman.

Moreover, Dr. Verazin asserts that although the Buckmans claim that they need this information to impeach him due to inconsistencies in his testimony at the two depositions, they do not identify any allegedly inconsistent statements. Lastly, the doctor argues that the Buckmans did not satisfy the required balancing test as set forth in *Stenger v. Lehigh Valley Hosp. Center,* 530 Pa. 426, 609 A.2d 796 (1992), which states:

> [W]e must engage in the delicate task of weighing competing interests. The factors which should be considered in deciding whether an intrusion into an individual's privacy is justified are the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury for disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Id.* at 801 (quoting *United States v. Westinghouse Electric Corp.,* 638 F.2d 570, 578 (3d Cir.1980)).

Likewise, the Health System and the Hospital contend that the discovery request violates the physician-patient privilege, which is codified at 42 Pa.C.S. § 5929, and states:

> No physician shall be allowed, in any civil matter, to disclose any information which he acquired in attending the pa-

tient in a professional capacity, and which was necessary to enable him to act in that capacity, which shall tend to blacken the character of the patient, without consent of said patient, except in civil matters brought by such patient, for damages on account of personal injuries.

These parties also cite 42 Pa.C.S. § 6155(a), which gives a "health care facility having custody of the charts or records ... standing to apply to the court ... before which the action or proceeding is pending for a protective order denying, restricting or otherwise limiting access to and use of the copies or original charts and records."

Next, quoting the *In re June 1979* case, the Health System and the Hospital explain that "[a]lthough the patients' medical records are the property of the hospital, the personal nature of the information they contain results in an obligation on the part of the hospital to maintain the confidentiality of the records." Health System's and Hospital's brief at 7 (quoting *In re June 1979,* 415 A.2d at 76). In light of this obligation on their part, the Health System and the Hospital assert that "[g]iven the large volume of patient records requested"[3] the "[m]ere redaction of names and social security numbers ... may not protect the identities of the patients, who could be directly or indirectly identified by other means." Health System's and Hospital's brief at 7.

Also with regard to the Buckmans' request for the non-party records for the purpose of impeaching Dr. Verazin, the Health System, the Hospital, and Dr. Verazin rely on the *Jones* case, which involved

---

**3.** At argument, the panel was informed that each year Dr. Verazin performed approximately twenty of the type of surgeries at issue here, thus, if the operative reports requested by the Buckmans were provided they would total about one hundred for the five-year period.

the disclosure of medical records of non-party patients with patients' names and other identifying information redacted. The plaintiffs in the *Jones* case sought these medical records to impeach the doctor hired by the defense to perform an independent medical examination (IME). The plaintiffs' purpose in securing these medical records was to show that the doctor who performed the IME "routinely failed to uncover objective signs of injury, thereby exposing his pro-defense bias." *Jones*, 852 A.2d at 1205. The *Jones* court explained that:

> [T]he law will not consider evidence that a person has done a certain act at a specific time as probative of a contention that he has done a similar act at another time. While the commission of an act charged cannot be proved by showing the commission of a like act at a different time, an exception to this rule exists where knowledge or intent is a material fact to be proved.

*Id.* (quoting *General Equipment v. Westfield Ins. Co.*, 430 Pa.Super. 526, 635 A.2d 173, 185 (1993)). Thus, because the reliability of the diagnosis by the IME doctor was at issue, the court noted that the records were germane to determine whether the doctor was biased. However, the *Jones* court then explained its reasoning for reversing the trial court's orders that directed the production of medical records, stating:

> It is at this point that the question arises as to what degree of privacy and confidentiality is to be afforded medical information where no privilege is involved. Our Supreme Court has recognized that the privacy interests protected by the federal Constitution receive the same protections from Pennsylvania's Constitution. In [*In re June* ] *1979 Allegheny County Investigating Grand Jury, supra*, the Court quoted *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct.

869, 51 L.Ed.2d 64 (1976), for the proposition that

> [w]hile its sources and limits may be disputed, there can be no doubt that the United States Constitution guarantees a right to privacy. Cases concerned with the constitutional protection of privacy "have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in making certain kinds of important decisions."

[*In re June* ] *1979, supra* at 77 (citations omitted).

> As in [*In re June* ] *1979,* the John and Jane Does whose records are sought here have a privacy interest in the disclosure of matters personal to them. However, unlike the situation in that case where the members of the grand jury who were to hear the evidence were sworn to secrecy, no such oath would be required here. Moreover, as noted above, the information sought is for impeachment purposes, an objective which could be accomplished by other, less intrusive, means, *e.g.,* the contrary testimony of another physician, or even by questions as to how many cases the doctor has seen, and of those how many have received diagnoses of minimal injury or none.

> Our Supreme Court has noted on more than one occasion that "the right [to privacy] is not an unqualified one; it must be balanced against weighty competing private and state interests." *Stenger v. Lehigh Valley Hospital Center,* 530 Pa. 426, 609 A.2d 796, 800 (Pa. 1992) (citation omitted). The interest here, a collateral evidentiary one, is not so weighty as to overbalance the need for confidentiality.

*Jones*, 852 A.2d at 1205–06 (footnote omitted).

The Buckmans counter Appellants' arguments by emphasizing the relevance of the records "to show Dr. Verazin's knowledge of the standard of care for the type of surgery performed on Mrs. Buckman." Buckmans' brief at 9. They quote the *In re June 1979* opinion, noting that with regard to the physician-patient privilege, "our case law has drawn a distinction between information learned by a physician through communication to him by a patient and information acquired through examination and observation." Buckmans' brief at 10 (quoting *In re June 1979*, 415 A.2d at 77). The Buckmans emphasize that "the privilege is limited to information which would offend the rationale of the privilege, *i.e.*, information directly related to the patient's communication and thus tending to expose it. Moreover, to fall within the terms of the statute, communications must tend to blacken the character of the patient." *Id.* (quoting *In re June 1979*, 415 A.2d at 77). Thus, the Buckmans allege that since the operative reports here "in no manner blacken the character of a patient" and "[were] not gained as a result of communications with the patient[,]" any constitutional concerns would not be offended. Buckmans' brief at 11.

Lastly, the Buckmans counter the defendants' claim that the operative reports are not relevant by quoting the definition of relevant evidence set forth in Pa.R.E. 401. That definition provides that " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. The Buckmans claim that "whether Dr. Verazin used a proper surgical technique" is at the heart of the matter. They also assert that "whether he was aware of the technique required by

[the] standard of care for the surgery he performed on Mrs. Buckman and his experience with the procedure at issue" are relevant questions. Buckmans' brief at 15. The Buckmans then discuss Dr. Verazin's statements at his two depositions and assert that the doctor's experience and the technique he used became relevant to challenge his testimony. They state that they "must be able to discover what Dr. Verazin knew or thought to be the standard of care, how, as a matter of his practice, he performed this particular surgery, and whether he is telling the truth." *Id.* at 16. Finally, they make a distinction between the operative reports they seek as opposed to the patients' entire medical records.

We are compelled to disagree with the Buckmans' position in this case. What Dr. Verazin knew or believed to be the standard of care is of no moment. In *Passarello v. Grumbine*, 29 A.3d 1158 (Pa.Super.2011), the issue before this Court involved whether jury instructions on the standard of care in a medical malpractice negligence suit should include an "error in judgment" instruction. The reasoning provided by the *Passarello* Court with reliance on *Pringle v. Rapaport*, 980 A.2d 159 (Pa.Super.2009), is instructive in that the Buckmans' argument to secure the discovery of the operative notes alternatively compares to a doctor's employment of the "error in judgment" rule to defend his or her actions. In *Passarello*, we stated that:

First, the "error of judgment" charge wrongly suggests to the jury that a physician is not culpable for one type of negligence, namely the negligent exercise of his or her judgment. This is simply untrue, since in all medical malpractice actions "[t]he proper focus is whether the physician's conduct (be it an action, a judgment, or a decision) was within the standard of care." If, on one hand, a physician's conduct violates the

standard of care, then he or she is negligent regardless of the nature of the conduct at issue. If, on the other hand, a physician's conduct does not violate the standard of care, then he or she has not, by definition, committed any culpable error of judgment. As such, after a jury has been charged on the fundamental principles regarding a physician's standard of care, adding an "error of judgment" instruction only confuses, and does not clarify, the determinative issue regarding deviation from the standard of care.

Second, the "error of judgment" charge wrongly injects a subjective element into the jury's deliberations. The standard of care for physicians in Pennsylvania is objective in nature, as it centers on the knowledge, skill, and care normally possessed and exercised in the medical profession. The "error of judgment" charge improperly refocuses the jury's attention on the physician's state of mind at the time of treatment, even though the physician's mental state is irrelevant in determining whether he or she deviated from the standard of care. Furthermore, by directing the jury's attention to what the physician may have been thinking while treating the patient, the jury may also be led to conclude that only judgments made in bad faith are culpable—even though a doctor's subjective intentions while rendering treatment are likewise irrelevant to the issues placed before a jury in a medical malpractice case.

*Passarello*, 29 A.3d at 1164–65 (quoting *Pringle*, 980 A.2d at 173–74 (emphasis added, footnote and citations omitted)). Simply stated, the law in Pennsylvania "only allows consideration of whether the care a physician rendered [falls] below the standard of care established by expert testimony[,]" it does not allow consideration of the subjective state of mind of the doctor when he or she undertakes to treat a patient.

*See id.* at 1167. *See also Toogood*, 824 A.2d at 1145 (stating that "[b]ecause the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury.").

Accordingly, we conclude that the trial court erred when it granted the Buckmans' motion to compel. The information relating to third parties that have not given their consent is confidential and is not relevant to the instant negligence claim in that actions taken by Dr. Verazin when operating on other patients is not probative of what his actions were when caring for Ms. Buckman. *See Jones.* The standard of care is an objective standard and does not contemplate a focus on a physician's state of mind. *See Passarello.* Moreover, as in *Jones,* the Buckmans here are seeking the operative reports in order to impeach Dr. Verazin, a use that the *Jones* court found could be "accomplished by other, less intrusive means" such as the testimony of another doctor or questions asked of the physician himself about his prior cases. Furthermore, the Buckmans' collateral evidentiary interest when weighed against the need for confidentiality of the records of third parties who have not given their consent does not overcome the right to privacy. *See Jones.* We, therefore, reverse the December 20, 2011 order granting the Buckmans' motion for reconsideration and their discovery requests.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.