J-S35005-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| EDWARD ERIC WILKINSON | : | |
| | : | |
| Appellant | : | No. 333 EDA 2018 |

Appeal from the Judgment of Sentence January 10, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0010593-2015

BEFORE:   BOWES, J., STABILE, J., and COLINS, J.[*]

MEMORANDUM BY BOWES, J.:                    **FILED: JANUARY 8, 2021**

Edward Eric Wilkinson appeals from his January 10, 2018 judgment of sentence of an aggregate term of six to twenty years of incarceration followed by two years of probation, which was imposed after a jury found him guilty of aggravated assault, carrying a firearm without a license, possession of an instrument of crime ("PIC"), and recklessly endangering another person ("REAP").  After careful review, we affirm.

We glean the relevant factual and procedural history from the trial court's Pa.R.A.P. 1925(a) opinion and the certified record.  The instant case concerns the non-fatal shooting of Kenyata Brown ("the victim"), which occurred on August 6, 2015.  On that day, the victim was on the porch of his home located at 5206 Sheffield Street in Philadelphia, Pennsylvania, with his

_____

[*] Retired Senior Judge assigned to the Superior Court.

girlfriend, Khadijah Warren, and their minor children. At some point, Aleya Perry and Shabira Perry (collectively, "the Perry sisters") approached the victim and his family. The Perry sisters were well-known to the victim and his family, as they were the adult children of Ms. Warren's cousin, Sebrena Wilkinson. On this day, however, familial amity gave way to conflict as an argument erupted amongst the Perry sisters and Ms. Warren.[1] At some point during this conflict, a cell phone call was made summoning Appellant, who was Ms. Wilkinson's husband, and Ms. Wilkinson to the scene.

After a protracted verbal altercation, the Perry sisters physically attacked Ms. Warren, and the victim intervened to break-up the fight. After a short break in hostilities, Appellant and Ms. Wilkinson arrived on the scene in a white Mercedes SUV, parked near the victim's home, and approached the combatants. Ms. Wilkinson immediately began to quarrel anew with Ms. Warren on her daughters' behalf, while Appellant approached the victim, pulled out a gun, and shot him in the leg.[2] Afterwards, Appellant and his family fled the scene in the aforementioned vehicle.

Members of the Philadelphia Police Department were alerted to the shooting and responded quickly:

---

[1] This argument seems to have originally stemmed from concerns that Aleya Perry had regarding the victim's treatment of Ms. Warren. *See*, *e.g.*, N.T. Trial, 10/24/17, at 68. Thereafter, the situation escalated dramatically.

[2] Specifically, it appears that Appellant and Ms. Wilkinson were angered that the victim had "put his hands" on their adult children in an effort to break up the above-described altercation. *See*, *e.g.*, N.T. Trial, 10/24/17, at 88, 92.

- 2 -

Philadelphia Police Officer Edward Oleyn testified . . . that on the night of August 6, 2015, he and his partner, Officer Michael Berkery, had been on routine patrol in a marked police car and in uniform when they . . . received radio calls of a shooting. The immediately responded to a chaotic scene filled with a myriad of people screaming. They observed [the victim] suffering and bleeding from a serious gunshot wound on the front porch of [his residence].

Trial Court Opinion, 6/6/19, at 4-5. As the officers were preparing to rush the victim to a nearby hospital, Ms. Warren identified the shooter as a "bald, black man in his forties that went by the name of Eric Wilkinson who had fled the scene in a white Mercedes Benz." *Id*. at 5. As a result of the above-described altercation, Ms. Warren suffered muscle strains, cuts, and bruises. The victim sustained a single gunshot wound from a .40-caliber handgun. *Id*. at 4.

Thereafter, the police secured and executed warrants for Appellant's arrest and a search of his home:

When subsequent search and arrest warrants were served by investigators . . . eleven firearms were confiscated from the residence that Appellant admittedly shared with his wife and step-daughters [on] the day after the shooting. Although proof of Appellant's purchase and ownership of a [.40-caliber] semi-automatic firearm that matched the caliber of weapon used to shoot the victim was retrieved, the actual firearm matching that description was not discovered [amongst] the guns confiscated.

*Id*. at 4. Appellant was charged with, *inter alia*, the aforementioned offenses. The case proceeded to a jury trial from October 23 to October 30, 2017.

On the first day of testimony, Officer Oleyn testified on behalf of the Commonwealth. During his direct examination, he stated that Ms. Warren had positively identified the shooter as Appellant and provided his name to law enforcement. *See* N.T. Trial, 10/24/17, at 44. This testimony did not

- 3 -

provoke an objection from Appellant. However, the prosecutor also undertook the following line of questioning:

> Q. When you first responded to the scene, who else was there aside from [the victim] and Ms. Warren?
>
> A. There was about five or six people out there, family members and such, outside the front of the house on the porch. It was a lot of yelling and screaming. I couldn't get too much information off them.
>
> Q. Just the porch at [5206] or was it neighboring porches as well?
>
> A. All I remember was 5206, everyone on the porch there.
>
> Q. While you were there did anyone approach you aside from Ms. Warren to give you information about what had taken place that night?
>
> A. **A couple other people gave me information about the 40-year-old black male, bald.**

*Id*. at 47-48 (emphasis added). Appellant objected, asserted that this testimony should be struck, and requested a mistrial at sidebar. *Id*. at 48-49 ("It was a hearsay identification by four unidentified people with no notice. . . . I think it's worthy of a mistrial.").

Ultimately, the trial court concluded that the Commonwealth had not properly laid a foundation for the above-quoted testimony and sustained Appellant's objection. *Id*. at 52. However, the trial court denied Appellant's request for a mistrial. *Id*. When the jury returned, the Commonwealth elicited testimony from Officer Oleyn establishing that the unnamed witnesses that provided a description of the shooter were "yelling and screaming" about the victim's condition at the time these identifications were given. *Id*. at 53.

Appellant entered another objection, which the trial court overruled on the ostensible basis that the identifications were "excited utterances." *Id*.

Ms. Warren also testified extensively at Appellant's trial on behalf of the Commonwealth. In addition to confirming that Appellant was the man who shot the victim, *id*. at 89-90; *see also* N.T. Trial, 10/25/17, at 9, Ms. Warren also described a series of threatening text messages that she received immediately after the incident from phone numbers that she did not recognize. *See* N.T. Trial, 10/25/17, at 13-16. The Commonwealth provided a copy of these text messages to Ms. Warren, who reviewed them during her testimony without objection from the defense.

However, when the Commonwealth attempted to publish the text messages to the jury, Appellant's counsel objected on the grounds that there was no "authentication" connecting these communications to Appellant and that the text messages were irrelevant. *Id*. at 16, 19-20. The Commonwealth averred that the evidence was being offered for its impact upon Ms. Warren and the victim, who was hesitant to cooperate with law enforcement at the beginning of the case.[3] *Id*. at 17-18. Ultimately, the trial court overruled Appellant's objection and permitted the at-issue text messages to be published to the jury. *Id*. at 19-20, 27-28.

---

[3] Ms. Warren testified that she shared the texts with the victim. *See* N.T. Trial, 10/25/17, at 18.

Thereafter, the victim took the stand, testified in a manner that corroborated Ms. Warren's version of events, and also identified Appellant as the shooter. *Id*. at 71, 81. Additionally, the victim explained that he had refused to cooperate with law enforcement in the immediate aftermath of the shooting and claimed that he could not identify the shooter because he initially wanted to seek retribution on his own. *Id*. at 76-77, 92-93. Ultimately, the victim's mother[4] convinced him to "do the right thing" by cooperating with the investigation and identifying Appellant as the shooter while recovering in the hospital. *Id*. at 80-81, 92-93.

On the third day of testimony, a salesperson at a local gun shop testified for the Commonwealth.[5] *See* N.T. Trial, 10/26/17, at 26-37. Specifically, she identified Appellant as an individual to whom she had previously sold firearms and stated that Appellant had purchased a.40 caliber Kahr pistol from the store on June 10, 2015. *Id*. at 30-33.

_____

[4] The victim's mother, Doris Scott, also testified on behalf of the Commonwealth. *See* N.T. Trial, 10/25/17, at 101-06. Her testimony was limited to confirming that she was present when the victim identified Appellant as the shooter in the hospital. *Id*.

[5] Prior to this testimony, Officer Edward Seislove of the Philadelphia Police Department appeared on behalf of the Commonwelath. *See* N.T. Trial, 10/26/17, at 10-25. Officer Seislove was a secondary responder who arrived on the scene as the victim was being evacuated to the hospital. In relevant part, he described finding a shell casing and a blood trail at the scene. *Id*.

Detective Robert Hagy of the Philadelphia Police Department was the next witness. He informed the jury that he recovered a spent shell casing from the scene of the shooting and testified regarding the search warrant that he secured and executed at Appellant's home. *Id*. at 58-62. The search resulted in the seizure of "multiple weapons, a rifle, shotguns, [and] ammunition." *Id*. at 62. Neither the Kahr pistol nor any other .40-caliber handgun was recovered from Appellant's home, but ammunition suitable for use in such weapons was seized.[6]

The admission into evidence of the firearms and ammunition seized from Appellant's home was a source of significant contention during the proceedings. Prior to trial, Appellant presented an oral motion *in limine* to exclude this evidence on the grounds that it was irrelevant and not sufficiently tied to the crimes charged. *See* N.T. Trial, 10/24/17, at 13-14. The trial court disagreed, and denied the motion after concluding that the firearms and ammunition were relevant, circumstantial evidence of Appellant's alleged ownership of the weapon used to shoot the victim. *Id*. at 16. The various firearms and the "loose" .40 caliber ammunition seized from Appellant's home were admitted into evidence over these objections.

Finally, Officer Kelly Walker of the Philadelphia Police Department took the stand for the Commonwealth as an expert in firearms identification. *See*

---

[6] A white Mercedes registered to Appellant's name and address was also seized, searched, and later returned. *See* N.T. Trial, 10/26/17, at 80-85.

- 7 -

N.T. Trial, 10/27/20, at 13. In pertinent part, she testified that: (1) the shell casing recovered from the scene of the shooting belonged to a .40 caliber weapon that was not recovered from Appellant's home; and (2) the shell casing recovered from the scene matched ammunition seized from Appellant's home. *Id*. at 24-25, 28-29. Thereafter, the Commonwealth rested.

Appellant's case began with Janell Robinson, who testified that she did not see who shot the victim. *Id*. at 71, 92. Thereafter, Appellant took the stand in his own defense. He denied shooting the victim and suggested that police had surreptitiously taken his .40 caliber Kahr handgun during the search of his home and intentionally failed to note it on the property receipt. *Id*. at 104-08, 118-20. Ultimately, Appellant conceded that he took no action prior to trial regarding this allegedly missing gun because he "thought it would fall on deaf ears." *Id*. at 135. Following the conclusion of Appellant's testimony, the defense rested.

On October 30, 2017, the jury found Appellant guilty of the above-noted offenses and not guilty of attempted murder. On January 10, 2018, the above-recited sentence was imposed by the trial court. Appellant filed a timely notice of appeal to this Court. Both Appellant and the trial court have complied with their obligations pursuant to Pa.R.A.P. 1925.

Appellant has raised three issues for our consideration:

I. Did not the lower court abuse its discretion in denying a mistrial for improperly admitting evidence of out-of-court statements of identification by unknown declarants against Appellant where

Appellant had not received notice of those statements as a matter of mandatory discovery?

II. Did not the lower court abuse its discretion in admitting unauthenticated, irrelevant and unfairly prejudicial text messages against Appellant?

III. Did not the lower court abuse its discretion in admitting irrelevant and unfairly prejudicial evidence of unrelated guns against Appellant?

Appellant's brief at 2.

At the outset of our substantive analysis, we note that all three of Appellant's claims concern the evidentiary rulings of the trial court. The following legal principles will guide our review:

> As our Supreme Court has explained, "[t]he admissibility of evidence is a matter solely within the discretion of the trial court. This Court will reverse an evidentiary ruling only where a clear abuse of discretion occurs." *Commonwealth v. Johnson*, 638 A.2d 940, 942 (Pa. 1994) (citation omitted). "Generally, an appellate court's standard of review of a trial court's evidentiary rulings is whether the trial court abused its discretion; however, where the evidentiary ruling turns on a question of law our review is plenary." *Buckman v. Verazin*, 54 A.3d 956, 960 (Pa.Super. 2012).

*Commonwealth v. Woeber*, 174 A.3d 1096, 1100 (Pa.Super. 2017). In this context, "[a]n abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. LeClair*, 236 A.3d 71, 78 (Pa.Super. 2020). Furthermore, before a ruling on evidence

constitutes reversible error, it must have been harmful or prejudicial to the complaining party. *See Lykes v. Yates*, 77 A.3d 27, 32 (Pa.Super. 2013).

Appellant's first issue implicates the bystander identifications testified to by Officer Oleyn. *See* N.T. Trial, 10/24/17, at 47-51. Ultimately, the trial court permitted the testimony to be admitted as "excited utterances" after the Commonwealth laid a proper foundation. *Id*. at 51-53. Appellant's argument on appeal is straightforward: "The lower court erred in admitting evidence of [an] out-of-court identification by unknown declarants. Furthermore, the lower court erred in failing to grant a mistrial for the Commonwealth's . . . improperly admitted statements of identification, when they had been improperly withheld from the defense[.]" Appellant's brief at 7.

We discern that Appellant is actually raising two separate issues under this claim: (1) that the trial court erred in admitting the hearsay identification evidence as "excited utterances" under Pa.R.E. 803(2); and (2) the Commonwealth committed a discovery violation under Pa.R.Crim.P. 573 by failing to provide this identification evidence to Appellant before trial. We will address these issues *seriatim*.

The following legal principles will guide our review of Appellant's arguments concerning hearsay:

> Hearsay is an out of court statement offered to prove the truth of the matter asserted. Pa.R.E. 801(C). Generally, it is not admissible, as it "lacks guarantees of trustworthiness fundamental to [our] system of jurisprudence." *Commonwealth v. Smith*, 681 A.2d 1288, 1290 (Pa. 1996). In order to guarantee trustworthiness, the proponent of a hearsay statement must

- 10 -

establish an exception to the rule of exclusion before it shall be admitted.

***Commonwealth v. Manivannan***, 186 A.3d 472, 480 (Pa.Super. 2018). Specifically at issue in this case is the excited utterance hearsay exception, which the Pennsylvania Rules of Evidence delineates as follows: "A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused. When the declarant is unidentified, the proponent shall show by independent corroborating evidence that the declarant actually perceived the startling event or condition." Pa.R.E. 803(2).

"While the excited utterance exception has been codified as part of our rules of evidence since 1998 . . ., the common law definition of an excited utterance remains applicable." ***Commonwealth v. Murray***, 83 A.3d 137, 157 (Pa. 2013). Our Supreme Court has recited that definition as follows:

> [A] spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person has just participated in or closely witnessed, and made reference to some phase of that occurrence which he perceived, and this declaration must be made so near that occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflected faculties . . . . **Thus, it must be shown first, that [the declarant] had witnessed an event sufficiently startling and so close in time as to render her reflective thought processes inoperable and, second, that her declarations were a spontaneous reaction to that startling event.**

***Id***. at 157-58 (emphasis added) (citing ***Commonwealth v. Sherwood***, 982 A.2d 483, 495-96 (Pa. 2009)).

Appellant asserts that the Commonwealth failed to present evidence that the unnamed declarants observed a startling event and that their declarations were spontaneous. **See** Appellant's brief at 9. In reviewing the testimony proffered by Officer Oleyn in support of the hearsay exception, we have significant concerns about the cursory nature of his testimony.[7] **See** N.T. Trial, 10/24/17, at 53. However, even if this testimony was admitted in error, it was harmless.

Under Pennsylvania law, the harmless-error doctrine "recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." **Commonwealth v. Hamlett**, 234 A.3d 486, 491 (Pa. 2020). Harmless error may exist if the reviewing court is convinced from the certified record that, *inter alia*, the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously

---

[7] **Cf. Commonwealth v. Upshur**, 764 A.2d 69, 75-76 (Pa.Super. 2000) ("The mere fact that the police officer inferred from the statements that the declarant must have witnesses the [startling event], or that the declarant said he witnessed the [startling event], does not lend any more credence or trustworthiness to the out-of-court statements. In order to justify the admissibility of such testimony, it is incumbent upon the party seeking its admission to persuasively and convincingly demonstrate by the use of **other corroborating evidence** that the declarant actually viewed the event of which he speaks." (emphasis in original)); Pa.R.E. 803(2).

admitted evidence. *See*, *e.g.*, *Commonwealth v. Fulton*, 179 A.3d 475, 493 (Pa. 2018). Generally speaking, the burden of persuasion with respect to establishing harmlessness rests upon the Commonwealth. *Id*.; *but see Commonwealth v. Hamlett*, 234 A.3d 486, 492 (Pa. 2020) ("[T]he availability of discretionary *sua sponte* review in appropriate cases serves as an exception to the ordinary rule that the government bears the burden of persuasion relative to harmless error.").

Assuming, *arguendo*, that the trial court erred in permitting Officer Oleyn to testify regarding the unnamed bystanders' general descriptions of the shooter, this evidence was merely cumulative of an identical hearsay description of the shooter provided by Ms. Warren and earlier testified to by Officer Oleyn. *See* N.T. Trial, 10/24/17, at 43 ("At that point we got a brief description of the male. It was a black male, 40s, bald head.").

Appellant did not object to this testimony. Moreover, we note that Ms. Warren's description would be admissible pursuant to the excited utterance exception at Rule 803(2), as independent corroborating evidence demonstrated that Ms. Warren had provided this spontaneous description of the shooter immediately after witnessing her husband being shot. *See* N.T. Trial, 10/24/17, at 90-92; N.T. Trial, 10/25/17, at 9-10. In addition to Ms. Warren's own testimony, a recording of her 911 call was also played for the jury, providing further corroboration of her having witnessed the shooting. *See* N.T. Trial, 10/24/17, at 8-10. Thus, any description of the shooter

provided by these bystanders was merely cumulative of Ms. Warren's unchallenged and properly admitted identification testimony.[8]

Turning to the second portion of Appellant's first issue, we note that Rule 573(B)(1)(d) provides that: "[i]n all court cases, **on request by the defendant**, and subject to any protective order . . . the Commonwealth shall disclose to the defendant's attorney . . . the circumstances and results of any identification of the defendant by voice, photograph, or in-person identification." Pa.R.Crim.P. 573(B)(1)(d) (emphasis added). Appellant asserts that the Commonwealth's failure to disclose the existence of the bystander identifications constituted a violation of Rule 573(B)(1)(d), and that the trial court erred in not granting a mistrial. **See** Appellant's brief at 10.

Appellant's argument on this issue spans a single paragraph, and is most notable in what it omits. Specifically, Appellant does not even suggest that he ever requested identification evidence from Commonwealth. The text of Rule 573 requires the Commonwealth to furnish mandatory discovery materials only upon receipt of a request from the defendant. **See** Pa.R.Crim.P. 573(B)(1); **see also**, **e.g.**, **Commonwealth v. Miller**, 560 A.2d 229, 231

---

[8] Furthermore, both the victim and Ms. Warren positively identified Appellant in open court and testified that they: (1) were personally acquainted with Appellant; and (2) had named him as the shooter to law enforcement prior to trial. **See** N.T. Trial, 10/24/17, at 43; N.T. Trial, 10/25/17, at 9, 71, 81.

(Pa.Super. 1989) ("[A] defendant must **first request** the item(s) of information deemed mandatory under the Rule." (emphasis in original)).[9]

Our review of the certified record has uncovered no indication that either any request for such discovery materials was ever submitted prior to or during trial. As such, Appellant has failed to demonstrate a pre-requisite for establishing a discovery violation by the Commonwealth. *Id*. Accordingly, no relief is due on this claim.[10]

Appellant's second issue alleges that the Commonwealth failed to authenticate the threatening text messages received by Ms. Warren.[11] **See** Appellant's brief at 10-11 ("The admission of unauthenticated text messages is a clear abuse of discretion.") (citing **Commonwealth v. Koch**, 39 A.3d 996, 1005 (Pa.Super. 2011) (holding that text messages were not properly

---

[9] This Court's holding in **Commonwealth v. Miller**, 560 A.2d 229, 231 (Pa.Super. 1989), adjudicated a dispute arising under a prior iteration of Pa.R.E. 573. **See** Pa.R.Crim.P. 305. However, as Rule 573 contains the same manner of language requiring a discovery request be submitted by defendants to trigger the Commonwealth's obligation, this precedent remains valid.

[10] Even assuming, *arguendo*, that the Commonwealth violated Pa.R.Crim.P. 573(B)(1)(d), we would deem this error harmless in conformity with our earlier discussion of Appellant's hearsay-related argument.

[11] To the extent that Appellant seeks to address additional issues beyond the authentication of these text messages, we hold that such claims are waived by Appellant's complete failure to develop any meaningful discussion in the body of his argument. **See**, **e.g.**, Pa.R.A.P. 2119(a). Indeed, Appellant's discussion of the discrete authentication issue discussed above is dangerously threadbare in that it incorporates one pertinent legal authority and a single citation to the reproduced record. **See** Appellant's brief at 10-11.

authenticated where a police officer transcribed messages from a criminal defendant's phone and the transcripts were admitted at trial)).

The Pennsylvania Rules of Evidence provide that, "[u]nless stipulated, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). As a general matter, "[a]uthentication entails a relatively low burden of proof; in the words of Rule 901 itself, simply 'evidence sufficient to support a finding that the item is what the proponent claims.'" **Commonwealth v. Murray**, 174 A.3d 1147, 1157 (Pa.Super. 2017). "Proof of **any circumstances** which will support a finding that the writing is genuine will suffice to authenticate the writing. . . . A proponent of a document need only present a *prima facie* case of some evidence of genuineness in order to put the issue of authenticity before the factfinder." **Gregury v. Greguras**, 196 A.3d 619, 633 (Pa.Super. 2018) (*en banc*) (emphasis added).

We emphasize that these text messages were admitted for the limited purpose of establishing their effect upon the listener, and the jury was so instructed by the trial court. **See** N.T. Trial, 10/25/17, at 33 ("[F]or the record, jurors, I want you to understand that the admission of these text messages is solely for the affect upon the listener, not for any other truth of the matter asserted."). Specifically, the Commonwealth offered these text

messages as an explanation for any reluctance on the part of Ms. Warren and the victim, both of whom viewed them.[12]  *Id*. at 17-20, 34-35.

The limited purpose of this evidence undercuts much of Appellant's arguments concerning the unreliability of these texts.  *See Schmalz v. Manufacturers & Traders Trust Co.*, 67 A.3d 800, 803 n.3 (Pa.Super. 2013) ("[W]here the statement is being offered to show its effect on a listener, it is not being offered for the truth of the matter and is non-hearsay."). Additionally, this limited admission distinguishes the instant circumstances from other cases where the authorship of text messages is relevant to authentication.  *Cf*. *Commonwealth v. Koch*, 39 A.3d 996, 1006 (Pa.Super. 2011) (holding that authentication of the authorship of text messages was necessary where "[t]he only relevance of the text messages and precisely the reason the Commonwealth sought to introduce them was because they demonstrated [the defendant's] intent to deliver [narcotics]").

Here, Ms. Warren was the recipient of the at-issue text messages and directly corroborated the facsimiles produced by the Commonwealth at trial. *See* 10/25/17, at 15 ("Yes.  They're the same ones.").  As a person with direct knowledge, Ms. Warren's testimony was sufficient to authenticate these communications for the limited purpose that they were offered by the

---

[12]  We gather from the certified transcripts that Ms. Warren was very nervous while testifying.  We also note that the victim initially refused to cooperate with law enforcement.  As such, we discern that the Commonwealth's concerns about the jury's perception of these issues was not mere chicanery.

Commonwealth. ***See***, ***e.g.***, ***Commonwealth v. Mangel***, 181 A.3d 1154, 1160 (Pa.Super. 2018) (citing Pa.R.E. 901(b)(1)) ("Testimony of a witness with personal knowledge that a matter is what it is claimed to be can be sufficient."). In sum, Appellant's arguments concerning authenticity fail.

Appellant's final claim relates to his assertion that "the lower court erred in admitting evidence of eleven guns unrelated to the crime." Appellant's brief at 11. Specifically, Appellant has structured his argument on this point to emphasize the potential for prejudice created by the Commonwealth's evidence concerning Appellant's extensive ownership of firearms. ***Id***. at 12 ("The admission of this evidence only placed Appellant in a negative light to illustrate that he is a person who associates with guns.").

However, no objection on the grounds of alleged prejudice was ever made by Appellant in the trial court. ***See*** N.T. Trial, 10/24/17, at 13-14 (presenting a motion *in limine* to exclude evidence of the firearms seized from Appellant's house on relevancy grounds); ***see also*** N.T. Trial, 10/26/17, at 67 ("We object to any of this, **because we thought it was irrelevant.**" (emphasis added)). To the extent that Appellant is now arguing that this evidence was unduly prejudicial, that claim has been waived. ***See Commonwealth v. Schoff***, 911 A.2d 147, 158 (Pa.Super. 2006) ("A defendant must make a timely and specific objection at trial or face waiver on her issue on appeal.") (citing Pa.R.A.P. 302(a)).

Furthermore, we find Appellant's remaining arguments concerning relevancy to be specious. Under the Pennsylvania Rules of Evidence, "[e]vidence is relevant if it has **any** tendency to make a fact more or less probable than it would be without the evidence[.]" Pa.R.E. 401(a) (emphasis added). The only objections entered at trial implicated by these claims concerned the relevancy of the physical firearms and ammunition seized from Appellant's home. *See* N.T. Trial, 10/24/17, at 13-16; N.T. Trial, 10/26/17, at 37-40; 64-68. The admission into evidence of weapons not expressly utilized in the commission of a crime is disfavored under Pennsylvania law. *See Commonwealth v. Robinson*, 721 A.2d 344, 351 (Pa. 1998) ("The general rule is that where a weapon cannot be specifically linked to a crime, such weapon is not admissible as evidence."). However, such evidence may be admissible where it is "relevant to the inquiry of whether the appellant had a weapon or implement suitable to commit the instant crime." *Id*. at 352.

Instantly, Appellant's use, possession, and ownership of a .40-caliber handgun was a material issue in this case. Despite evidence confirming that Appellant had purchased such a weapon in 2015, none was recovered during the search of Appellant's home. In the absence of this weapon, Appellant called into question the veracity and thoroughness of the police search. *See* N.T. Trial, 10/26/17, at 37 ("In the opening statements it was identified by [Appellant's counsel] that for some reason the .40 caliber gun wasn't picked

- 19 -

up by police.").[13]  Indeed, Appellant's counsel explicitly demanded that the Commonwealth leave no stone unturned in admitting the totality of the firearms and ammunition seized from Appellant's home.  *Id*. at 67 ("[I]t's counsel's case.  I had objected to all of this originally.  **If you're going to do it, you have to do it completely.**" (emphasis added)).  Consequently, the Commonwealth introduced **all** of the physical evidence seized from Appellant's home to demonstrate the completeness and competency of the police search effort.  *Id*. at 38-40; 64-68.  Appellant's chosen tact in challenging the police search made the admission of all of the firearms and ammunition a relevant part of the Commonwealth's case-in-chief.  Accordingly, no relief is due on Appellant's third claim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/8/21

---

[13]  Opening statements of counsel were not transcribed in this case.